In the Matter of the Judicial Settlement of the Intermediate Account of Proceedings of HELEN G. RHINELANDER and HARRY CIVILETTI, as Executors, etc., of PHILIP RHINELANDER, Deceased.

ADELAIDE R. THOMAS and GEORGE UNGAR, as Special Guardian for PHYLLIS MARIE RHINELANDER and Others, Infants, etc., Appellants; HELEN G. RHINELANDER and HARRY CIVILETTI, as Executors, etc., of PHILIP RHINELANDER, Deceased, ALICE JONES, ELIZABETH B. KEOGH, MARY B. KEOGH, MARGARET B. KEOGH, ANNE K. GOMEIN and LAUGHLIN, GERARD, BOWERS & HALPIN, Former Attorneys for Deceased, Respondents.

Second Department, July 6, 1942.

*Hyman R. Friedman,* for the appellant Adelaide R. Thomas.

*Frederick E. Weinberg,* for the appellant George Ungar, as special guardian, etc.

*Walter H. Thacher,* for the respondents Elizabeth B. Keogh, Mary B. Keogh, Margaret B. Keogh and Anne K. Gomein.

*Robert P. Smith* [*James M. Pollock* with him on the brief], for the respondent Alice Jones.

*Stephen J. McTague*, for the respondents Helen G. Rhinelander and Harry Civiletti, as executors, etc.

LAZANSKY, P. J.   Appeal by residuary legatees from so much of a decree of the Surrogate's Court, Nassau County, settling the intermediate account of the executors, as allows the claim of one Alice Jones as a valid claim against the estate of decedent Philip Rhinelander, and as adjudges that the legacy in favor of four persons in paragraph " Fifth " of the will is a valid testamentary disposition.

The claim of Alice Jones arises from the following facts: Alice and testator's son Leonard were married on October 14, 1924. He was white; she was colored.   They lived together until November 16, 1924.   In an action for annulment against Alice on the ground that she refrained from telling Leonard that she was colored, there was judgment for Alice on the merits, after a trial by a jury upon framed issues.   (*Rhinelander* v. *Rhinelander*, 219 App. Div. 189; affd., 245 N. Y. 510.)   In June, 1929, she commenced an action in this State against Philip for damages in the sum of $500,000 for alienation of affections.   Leonard went to Nevada where, in August, 1929, he commenced an action for divorce on the ground of cruelty.   Service of the summons and complaint was made by publication and by mail on Alice in this State.   A default decree granting the divorce was entered on December 27, 1929.   It is conceded that such decree had no binding force outside of the State of Nevada.   In February, 1930, Alice commenced an action for separation in this State.   Thereafter negotiations were entered into between Philip, Leonard and Alice for the purpose of adjusting their differences.   This resulted in the execution in July, 1930, of the agreement by Alice and Leonard, and the guaranty by Philip, which form the basis of the claim in dispute.

The agreement was to be construed according to the laws of Nevada.   It provided that Leonard would not oppose any application made by Alice to vacate or amend the Nevada decree by providing for her future maintenance, or to permit her to interpose a defense to the action, as she may in her sole discretion decide, and also provided for the payment to Alice of lump sums aggregating $31,500, and annual payments of $3,600 or $3,800, either as long as she lived or as long as she remained the wife of Leonard, according to the circumstances (a) if the court found that Alice had a good defense; (b) if the court granted a modification of the original decree; (c) if the court denied her petition to

vacate the decree. When the facts and circumstances are examined and the cloak of formal words and phrases is removed, it clearly appears that the agreement was a contrivance to make that appear to be legal which had an unlawful purpose, *i. e.*, to develop an ineffective Nevada decree of divorce into one which bore the badge of general full faith and credit.

This conclusion is justified by the facts. After one month of marriage, the parties separated and that separation continued for a period of six years until the time of the execution of the agreement. Leonard was anxious to be rid of his wife. She wanted support. There is no proof that, for the six years they were apart, she was supported by her husband or anybody else. Alice made no effort to vacate the Nevada decree to enable her to present a defense. Her petition merely prayed for a modification of the decree so that the property agreement be made a part thereof. Leonard's consent, which was executed before the petition was verified, was that the decree be modified to conform to the property agreement. There was no consent that the decree be opened to enable Alice to defend. There is not the slightest proof that she had ever been guilty of cruelty to Leonard, although in her petition to the Nevada court she said that she was informed and believed that her husband had offered proof in support of his charge of cruelty. The agreement and guaranty were not delivered until after the signing of the decree, which modified the original decree by incorporating the agreement. The lawyer for Leonard admitted that the understanding was that the agreement and guaranty would not have been delivered and the money paid if the decree had not been signed, although the agreement provided that there was to be a payment even if the court denied Alice's petition to intervene. This testimony was not contradicted by the attorney for Alice. All that was sought to be accomplished under the agreement in Nevada could have been done in New York, save the one all-important item — a full-fledged divorce for Leonard.

Payments were made under the agreement until the death of Leonard in 1936, and thereafter until the death of Philip in March, 1940. In May of the latter year Alice filed her claim herein. The executors allowed the claim after having been advised by eminent New York counsel that the liability of Philip under his guaranty continued after the death of Leonard, and by Nevada counsel that the court having jurisdiction of the parties and having adopted the agreement by consent and incorporated it in the amended decree, the agreement became valid. Neither counsel gave an opinion touching on the question of invalidity as against public policy, presently under consideration. Philip was in no wise a party to the Nevada decree.

The case involves three questions: (1) Is an agreement valid, the primary purpose or one of the primary purposes of which is to make a judgment of divorce, which has no force outside of the jurisdiction where granted, a judgment which is effectively recognized in other jurisdictions? (2) Are appellants estopped to deny the validity of the agreement? (3) What is the effect of the allowance of the claim, in good faith, by the executors?

In considering the first question, it must be borne in mind that Philip was not a party to the Nevada action and was, therefore, not bound by any effect that the Nevada decree may have had upon the agreement.

The inflexible rule in this State has been that all agreements, a consideration of which tends to encourage the severance of the marriage relationship, are abhorrent to public policy and are, therefore, illegal and unenforcible. (*Gould* v. *Gould*, 261 App. Div. 733, citing *Schley* v. *Andrews*, 225 N. Y. 110; *McDonald* v. *McDonald*, 228 App. Div. 341, and other cases.) It is conceded that the law in this respect is the same in Nevada as in New York. A contract for a single consideration is wholly void if that consideration is paid in part for an illegal act. (*Boylston Bottling Co.* v. *O'Neill*, 231 Mass. 498; 121 N. E. 411; Restatement, Contracts, § 607; 6 Williston on Contracts [rev. ed.], § 1780.) Of course, where the valid may be completely separated from the illegal, then the legal part may be sustained (*Murray* v. *Narwood*, 192 N. Y. 172; Williston, *supra*); but there is no such situation here. It follows, therefore, that the agreement was illegal and unenforcible. Although Leonard had a divorce in Nevada, the decree was only valid and binding in that State. It had no extraterritorial force. It was not binding on Alice. In obtaining the modified decree under the agreement, it was really by and with the consent of Alice. Although the agreement provided that she might defend, it appears that she never intended to do so. It was the expression of a mere pretense. As a result of the agreement, the original decree had extraterritorial force. It was entitled to recognition in other States. To agree to give the original Nevada decree the same force and effect as if it had been originally obtained after appearance is as much against public policy as an agreement to procure a divorce. (*Guggenheim* v. *Guggenheim*, 168 N. Y. Supp. 209, not officially published, citing *Blank* v. *Nohl*, 112 Mo. 159, 170; 20 S. W. 477; affd., 183 App. Div. 931; *Parnova* v. *Shaw*, N. Y. L. J. Nov. 3, 1938, p. 1459, per McLaughlin, J. See dissenting opinion of Lehman, J., in *Bloom* v. *Bloom*, 134 N. Y. Supp. 581, not officially published, Appellate Term, 1st Dept.)

An illegal contract may not be made legal by estoppel. (*Doherty v. Bartlett*, 81 F. [2d] 920; *Wheeler* v. *Wheeler*, 5 Lans. 355; 13 C. J., Contracts, § 453; 17 C. J. S., Contracts, § 279; 12 Am. Jur., Contracts, § 222.)

Section 210 of the Surrogate's Court Act provides that upon any accounting or judicial settlement of an account, where the executor or administrator admits and allows a claim or debt against the deceased, other than his own claim, the validity of such claim or debt shall be thereby established, but any party adversely affected by such allowance may file objections thereto and may show that the claim or debt was fraudulently or negligently allowed. Here there was no fraud or negligence in allowing the claim. Surely it could not have been intended by section 210 that if an executor allowed a claim in good faith, his act constituted a binding adjudication of the validity of the claim. The allowance of a claim by an executor may raise a *prima facie*, but does not create a conclusive, presumption of validity. (*Matter of Dole*, 168 App. Div. 253.)

It is also urged by Alice that the guaranty of Philip was separate and distinct from the agreement between Alice and Leonard and that it had no relation to the invalid provisions of the agreement between Alice and Leonard. The guaranty in part recites: " In consideration of the sum of One ($1.00) Dollar and other valuable considerations, and of the agreements contained in the above instrument, I hereby guarantee each and every of the payments required to be made in the above agreement * * *." Thus, in effect, the agreement between Alice and Leonard is incorporated in the guaranty and becomes a part thereof. The form of execution also indicates that the agreement and guaranty were one transaction. It is significant that the agreement between Alice and Leonard recites the action brought against Philip by Alice for alienation of affections in the sum of $500,000 and recites the agreement on the part of Alice to release — and, in fact, she does by the agreement release — Philip from the alienation suit. In the agreement Alice promised to execute a general release to Philip, excepting therefrom his liability created under the guaranty annexed. As the agreement is void, so also is the guaranty. The claim of Alice is unlawful and should, therefore, be rejected.

Paragraph " Fifth " of the will is not a restraint on the alienation of the property therein mentioned (Pers. Prop. Law, § 11) as the annuitants and those entitled to the residuary could join in a transfer thereof at any time. (*Matter of Guggenheimer*, 168 Misc. 1.) The test of alienability of real or personal property is that there are persons in being who can give a perfect title. " Where

there are living parties who have unitedly the entire right of ownership, the statute has no application." (*Williams* v. *Montgomery*, 148 N. Y. 519, at p. 526.) Absolute ownership is suspended in one of two ways: (1) by the creation of a trust which vests the estate in trustees; (2) by the creation of future estates vesting upon the occurrence of some future and contingent event. (*Wilber* v. *Wilber*, 165 N. Y. 451; *Steinway* v. *Steinway*, 163 id. 183.) Neither is the case here.

The decree should be modified on the law and the facts and the matter remitted to the Surrogate's Court for the entry of a decree rejecting the claim of Alice Jones as illegal and invalid; and, as so modified, the decree, in so far as appealed from, should be affirmed, with costs to appellants, payable out of the estate.

Present — LAZANSKY, P. J., HAGARTY, CARSWELL, ADEL and TAYLOR, JJ.

Decree of the Nassau County Surrogate's Court modified on the law and the facts by providing that the claim of Alice Jones be rejected as illegal and invalid; and, as so modified, the decree, in so far as appealed from, is unanimously affirmed, with costs to appellants, payable out of the estate, and the matter remitted to the Surrogate's Court for the entry of a decree accordingly.