In the Matter of the Accounting of HELEN G. RHINELANDER et al., as Executors of PHILIP RHINELANDER, Deceased. ALICE JONES, Appellant; ADELAIDE R. THOMAS et al., Respondents.

Argued January 6, 1943; decided March 4, 1943.

*Robert P. Smith, Ione P. Barrett* and *Randall I. Cohen* for appellant.

*Stephen J. McTague* for Helen G. Rhinelander et al., as executors, respondents.

*Hyman R. Friedman* for Adelaide R. Thomas, respondent.

*Frederick E. Weinberg* for George Ungar, special guardian for Phyllis M. Rhinelander et al., Infants, respondents.

DESMOND, J.   On an executors' accounting in this estate, there came up for determination the claim of appellant Alice Jones, which claim had been allowed by the executors, but was objected to by certain legatees, who are respondents here. Alice Jones had been from 1924 to 1929 the wife of Leonard Rhinelander, son of the deceased.   Leonard Rhinelander died in 1936.   The claim here litigated bases itself on the terms of an agreement made in 1930 in Nevada between Alice Jones, Leonard Rhinelander and the testator.   The agreement, among other things, required Leonard Rhinelander to pay his former wife, claimant-appellant Alice Jones, $3,600 a year, for her support, as long as she should live.   Subjoined to that writing was a promise signed by Philip Rhinelander, father of Leonard, in these words:  ''I hereby guarantee each and every of the payments required to be made in the above agreement by the party of the first part [his son Leonard] to the party of the second part [claimant Alice Jones], and this obligation shall be binding upon my heirs, executors and administrators.''   The objections by the legatees to the allowance of the claim of Alice Jones were on two grounds:  *first,* that the terms of this guaranty agreement did not carry its obligation beyond the guarantor's death and, *second,* that the whole agreement was illegal because of its connection with a Nevada divorce proceeding.   There was a trial of these objections before the Surrogate, and he dismissed the objections and allowed the claim, ruling against the objectants as to both the above-stated grounds.   In the Appellate Division there was a unanimous modification and a direction for rejection of the claim '' as illegal and invalid.''   The rationale of the Appellate Division's decision was stated thus in that court's opinion:  ''When the facts and circumstances are examined and the cloak of formal

words and phrases is removed, it clearly appears that the agreement was a contrivance to make that appear to be legal which had an unlawful purpose, *i. e.*, to develop an ineffective Nevada decree of divorce into one which bore the badge of general full faith and credit." (264 App. Div. 607, 609.) We proceed to an examination of this question of illegality, taking into account the terms of the written agreements, the relationships of the parties and the important circumstances revealed by the testimony before the Surrogate.

The agreements so held by the Appellate Division to be tainted and corrupt were made in 1930, but an examination of their full history takes us six years farther back. Leonard Rhinelander, son of the testator, and Alice Jones were married in October, 1924. They separated after one month and never lived together again. Instead the husband, in November, 1924, sued for an annulment. His suit was defeated. In 1929 the wife sued her husband's father (testator here) for alienation of affections, accusing the father of wrongfully causing the estrangement. Later in the same year the husband betook himself to Nevada where he brought a suit for divorce on the ground of cruelty. Service of the process in that suit, on the wife who remained in New York, was by publication and mailing, only. The decree of divorce which the Nevada court thereupon awarded to the husband in December, 1929, contained no provision whatever for the wife's support and maintenance, nor had any such provision been made, by the husband elsewhere or in any manner, for such support. Two months later (February, 1930), the wife, to enforce her claim of a right to be maintained at the expense of her husband, and notwithstanding the outstanding Nevada decree dissolving the union, sued Leonard Rhinelander in New York for a separation. Soon afterwards and while these two New York suits were pending against the father and the son, respectively, conversations began between attorneys representing the three parties to those suits. These conversations produced, in time, the agreement which the Appellate Division has held to be illegal. We think it important here to emphasize these unquestioned facts: That when these 1930 negotiations began the parties had been separated for about six years, that Leonard Rhinelander was then living in Nevada and had been awarded a judgment of

divorce by the courts of that State, that in the getting of that divorce there had been no concert or collusion between husband and wife, that the wife was not receiving any support from the husband, and that the wife was asserting claims against her husband (for alimony) and his father (for damages for alienation of affections) in the New York courts.

The agreements now before us were drawn in New York City by a lawyer who represented both the Messrs. Rhinelander. They were signed first by claimant, then by Mr. Rhinelander, Sr., both these signings taking place in New York City; Leonard Rhinelander then signed the papers in Nevada. Delivery of the agreements, however, was not made until after claimant, through her attorney, had made a formal appearance and intervention in the Nevada suit in which Leonard Rhinelander had obtained his divorce decree, and after claimant had petitioned for, and been awarded, a modification of that decree incorporating therein the provisions of the agreements, already signed but not delivered, for her future support and maintenance.

The provisions of the agreements may be summarized thus: *First* it is recited that the parties have separated, that they desire to settle forever their property rights and that claimant wishes to apply to the Nevada courts to reopen the divorce decree either in order to have it modified to include a support provision, or in order to put in a defense in the action. Then we find a provision for the payment to her by her former husband of a sum for counsel fees, and $3,600 ($3,800 under certain circumstances) a year for life for her support, these payments to be made on and after she should do any one of these three things: reopen the divorce decree and successfully defend the suit, or reopen the decree and obtain a modification thereof by way of a provision for her support, or petition for, but be refused by the court, a reopening of the decree. Claimant on her part covenanted to discontinue the two actions pending in New York against the Messrs. Rhinelander, to deliver to Mr. Rhinelander, Sr., a release of any liability for the alleged alienation of affections and a release of her rights to share in the son's estate, and to waive and release any right to use the name of Rhinelander. The agreement by the elder Rhinelander to guarantee all the payments promised by his son has

already been described herein. After the Nevada court had reopened its decree on claimant's motion and had modified it by including as a term thereof the above summarized agreements for claimant's support, the agreements executed by the father and son were delivered to her. She thereafter regularly (before and after the death of Mr. Rhinelander, Jr., in 1936) received from Mr. Rhinelander, Sr., the moneys due her under the agreements until, after the death of the elder Rhinelander in 1940, the payments stopped. In its opinion the Appellate Division quotes undisputed testimony which is to the effect that, regardless of the words of the agreement, the real intent of the parties was that the agreements would not have been delivered had not the Nevada decree been reopened on claimant's appearance and petition, and the agreement for support written into that decree. We accept that statement in the Appellate Division's opinion as being in the nature of a finding of fact. We accept also, for present purposes, and we give effect to, another statement in the Appellate Division's opinion that in substance what claimant did by these negotiations, agreements and court appearances in Nevada was "to agree to give the original Nevada decree the same force and effect as if it had been originally obtained after appearance * * *." We, however, find it impossible to concur with the conclusion of law in the Appellate Division's opinion, that claimant's agreements and activities in 1930 were " as much against public policy as an agreement to procure a divorce." (*supra,* p. 610.)

There will be no disagreement as to the quality of the court's duty in this case. We are not giving utterance to our own views on social questions. " * * * when we speak of the public policy of the State, we mean the law of the State, whether found in the Constitution, the statutes or judicial records." (*Glaser* v. *Glaser,* 276 N. Y. 296, 302.) Finding nothing in those repositories which invalidates, or requires invalidation of this testator's guaranty agreement, we are bound to enforce that agreement according to its terms.

It is no part of the public policy of this State to refuse recognition to divorce decrees of foreign states when rendered on the appearance of both parties, even when the parties go from this State to the foreign state for the purpose of obtain-

ing the decree and do obtain it on grounds not recognized here. (*Glaser* v. *Glaser, supra,* p. 302.) Nor is it our public policy to refuse enforcement to a separation agreement incorporated into such a foreign divorce. (*Hess* v. *Hess,* 276 N. Y. 486.) We do have a statute nearly fifty years old, and expressing a prohibition much older, which lays down the rule that " a husband and wife cannot contract to alter or dissolve the marriage * * *." (Domestic Relations Law, § 51.) This Court has never hesitated to enforce that statute and to strike down any agreement fairly within its intendment. (*Schley* v. *Andrews,* 225 N. Y. 110; *Murthey* v. *Murthey,* 287 N. Y. 740; *Harris* v. *Harris,* 287 N. Y. 444.) But going back as far as 1835 (*Daggett* v. *Dagett,* 5 Paige 509) we find no expression of public policy justifying the annulment of the agreement we are scrutinizing here. In the *Daggett* case " the Chancellor said, that so long as the marriage contract remained in force, the wife was not legally competent to make a valid contract with her husband in relation to her right to alimony; and that such agreements made in advance, * * * would have a tendency to produce collusion between parties with a view to the dissolution of the marriage contract between them." The Chancellor went on to say that such an agreement, to receive the sanction of the court, must either be shown to the court to be perfectly fair and equitable or " must be made after the bond of matrimony had actually been dissolved, as to the wife, by a decree of the Court." Since the time of *Daggett v. Daggett,* we have moved in the direction of legalizing separation agreements made during marriage, so long as they are not agreements *to separate* or to release the husband from his obligation to support the wife. (*Clark* v. *Fosdick,* 118 N. Y. 7; *Galusha* v. *Galusha,* 116 N. Y. 635; *Winter* v. *Winter,* 191 N. Y. 462.) In pursuance of our settled policy to favor the continuance of the marriage relation, we have, however, consistently refused enforcement to a separation or support agreement shown to be part of a scheme *to obtain or facilitate a divorce,* as when the husband promises to pay alimony as a reward to his wife for getting a divorce, or when the money provisions for her support are a premium or award, inducement or advantage to the wife for procuring a divorce. (*Lake* v. *Lake,* 136 App. Div. 47; *Schley* v. *Andrews, supra.*) "A bargain to obtain a divorce or the effect of which

is to facilitate a divorce, is illegal.'' (Restatement of the Law of Contracts, § 586.) Some of the New York cases have gone beyond the letter of the statute (Domestic Relations Law, § 51), which refers in terms only to a '' contract to alter or dissolve the marriage '' and have refused sanction to agreements which directly tended toward such a dissolution. But our progress in the direction of broadening the coverage of section 51 has gone no further than to apply that section, and its policy, to agreements which have a *direct* tendency toward dissolving marriages. In *Butler* v. *Marcus* (264 N. Y. 519) the husband and wife, while living apart, made an agreement whereby a generous amount for the wife's support was to be paid monthly for one year, the payments to stop at the end of the year if the parties were then still married; but if before the end of that year either party should obtain a divorce, then the payments should continue. The wife obtained a Nevada divorce before the end of the critical year. To a suit brought by her against her former husband on the agreement, the defense was asserted that the agreement was void as against public policy and in violation of section 51 of the Domestic Relations Law. This court affirmed an order striking out that defense as insufficient in law and granting plaintiff summary judgment.

No case examined by us goes so far as to say that a support agreement made *after* the entry of a foreign divorce decree, is unenforceable because in connection with the making of the agreement the wife put in an appearance in the foreign suit and thus gave the decree some appearance of due process, which it otherwise might seem to lack. In the present case claimant Alice Jones had sued for support in New York. She had sued her husband's father for another cause. She was told that the husband and his father were willing to settle those claims of hers and make provisions for her support throughout her life. Let us infer as did the Appellate Division, that the husband and his father insisted that the arrangement must take the form of a reopening and modification of the divorce decree, on the wife's application. The parties had long been separated and there was outstanding a judgment of divorce entered in the state where the husband had taken up his residence. The parties had been and were embroiled in bitter litigation in this State. Essentially the 1930 arrangement

was a settlement of money claims growing out of a marriage already dissolved. Accepting the strongest and most sweeping expression of the rule of public policy here involved, going even so far as does the text-writer Bishop (Marriage, Divorce and Separation, vol. 2, §§ 691, 702, 730) when he says that an agreement is invalid if it " stimulate the divorce " or is " promotive of divorce " and that such an agreement " vitiates every other bargaining of which it forms an inseparable part " we cannot reasonably apply any such concept or any such rule to the arrangement described in this record. "A contract which binds one of the parties to do that which is contrary to the policy of the state or nation is void " (*Matter of Hughes,* 225 App. Div. 29, 31; affd., 251 N. Y. 529) but the contract here did not, in terms or in meaning, so bind anyone.

Our views on the question of the legality of testator's promise make it unnecessary to discuss various other questions argued before us, including the possible separability of the supposedly illegal from the confessedly legal, undertakings of the agreement, or the alleged estoppel of testator and his estate. Nor is it necessary at this time to compare *Haddock* v. *Haddock* (201 U. S. 562) with *Williams* v. *North Carolina* (317 U. S. 287.)

The Appellate Division's modification of the Surrogate's decree was " on the law and the facts." As we have said above, we consider that these agreements are enforceable, on the Appellate Division's own view of those facts which bear on the question of legality. As to the other question set up by the objections, that is, whether or not the obligation of the guaranty survived testator's death, we have no doubt of the correctness of the Surrogate's holding that it did so survive.

The order of the Appellate Division in so far as it modifies the decree of the Surrogate's Court should be reversed and the decree of the Surrogate's Court affirmed with costs in this court and in the Appellate Division, payable out of the estate.

LEHMAN, Ch. J., LOUGHRAN, FINCH, RIPPEY and LEWIS, JJ., concur; CONWAY, J., dissents on opinion of LAZANSKY, P. J., in the Appellate Division.

Ordered accordingly.