Scileppi, J. (dissenting).
I agree with the Chief Judge inasmuch as he would hold that these divorces are void; however, I would permit the present appellants to succeed on this appeal.
As we analyze the cases in this area, we must be ever mindful that we are not dealing with a decree of a sister State, but with one of a foreign nation. Decrees of a foreign nation are not only not entitled to full faith and credit, but are not even entitled to prima facie validity despite any allegation of jurisdiction which may appear on the face of the judgment (Rosenbaum v. Rosenbaum, 309 N. Y. 371, 375). The sole criterion by which these decrees may be judged is whether they contravene our public policy (Rosenbaum v. Rosenbaum, 309 N. Y. 371, 375, supra).
It is fundamental to our concepts of jurisprudence that a court which purports to act must have jurisdiction over the subject matter of the action. The general rule has become firmly established that jurisdiction over the subject matter of an action for divorce depends upon the domicile of at least one party in the decree rendering forum (Senor v. Senor, 272 App. Div. 306, 310-311, affd. 297 N. Y. 800; Solotoff v. Solotoff, 269 App. Div. 677; see, also, Matter of Lindgren, 293 N. Y. 18, 24).
In Williams v. North Carolina I (317 U. S. 287, 298) the Supreme Court held that domicile of one party creates an adequate relationship with a State to justify its exercise of power over the marital relationship. And in Williams v. North Carolina II (325 U. S. 226, 229-230) Mr. Justice Frankfurter had the following to say about this fundamental concept: “ Under our system of law, judicial power to grant a divorce — jurisdiction, strictly speaking—is founded on domicil. Bell v. Bell, 181 U. S. 175; Andrews v. Andrews, 188 U. S. 14. The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it. Domicil implies a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance. The domicil of one spouse within a State gives power to that State, we have held, to dissolve a marriage wheresoever contracted. In view of Williams v. North Carolina, supra, the jurisdictional requirement of domicil *80 is freed from confusing refinements about ‘ matrimonial domicil,’ see Davis v. Davis, 305 U. S. 32, 41, and the like.”
Belying heavily on Williams II, the Third Circuit (per Goodrich, J.) held that domicile is the indispensable element of divorce jurisdiction (Alton v. Alton, 207 F. 2d 667, 677, judgment vacated and the proceeding dsmd. as moot 347 U. S. 610).
To characterize one as a “ domiciliary ” is to clothe him with the strongest possible ties to a jurisdiction. However, this court has held that domicile, in a strict sense, is not required before a foreign nation may render a divorce decree affecting our citizens (Gould v. Gould, 235 N. Y. 14)[1]. In that case, husband and wife, New York domiciliaries, moved to France, purchased a house and dwelt there for five years. After this period, the husband brought suit for divorce in France on the ground of adultery, and judgment in his favor was rendered by the French court, applying New York law. On a motion for judgment on the pleadings in an action for divorce by the wife in New York, this court, carefully limiting itself to the circumstances of the case, held that Special Term was correct in declaring that the French decree did not offend our public policy and was entitled to recognition under rules of comity (p. 29). The court (per Hogan, J.) emphasized the undisputed fact that the parties had established a bona fide residence in France, and, in the concluding paragraph of the opinion, took pains to note: “If in the instant case the judgment of the courts of France disclosed that the parties were merely sojourning in France at the time the decree of divorce was granted, or that a residence in France was of such limited duration as to lead the ¡Supreme Court to believe that the decree was the result of collusion, or the judgment was rendered for a cause not recognized as sufficient cause for absolute divorce by the law of this State, it may be that the justice presiding would be justified in holding that the decree was contrary to the policy of this state and in a refusal to give effect to the evidence sought to be established thereby. We leave those questions open.” (Gould v. Gould, 235 N. Y. *81 14, 29-30, supra). It is obvious, therefore, that New York requires that there be a relationship of substantial permanence between the decree rendering nation and the subject matter of the action, the marital res. Lack of jurisdiction over the subject matter of a controversy cannot, of course, be cured by the mere personal appearance of the parties (Matter of Lindgren, 293 N. Y. 18; Solotoff v. Solotoff, 269 App. Div. 677).
Would the public policy of our State be served by departing from that well-established rule 1 I do not believe so. Illustrative of the many cases emphasizing the vital stake which the State has in every marriage contract is Fearon v. Treanor (272 N. Y. 268) wherein this court stated (pp. 272-273):
“ Marriage is more than a personal relation between a man and woman. It is a status founded on contract and established by law. It constitutes an institution involving the highest interests of society. It is regulated and controlled by law based upon principles of public policy affecting the welfare of the people of the State. 1 Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the Legislature. That body prescribes the age at which parties may contract to marry, the procedure of form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute" grounds for its dissolution.’ (Maynard v. Hill, 125 U. S. 190, 205.)
‘ ‘ There are, in effect, three parties to every marriage, the man, the woman and the 'State. (Trammell v. Vaughan, 158 Mo. 214.) * * * The Domestic Relations Law provides in great detail when and how marriage may be entered into, how the relation may be dissolved, the grounds for divorce and annulment, the rights and liabilities of husband and wife, the age at which the relation may be entered into and the class of persons who are disqualified from marrying.
‘ ‘ From time immemorial the State has exercised the fullest control over the marriage relation, justly believing that happy, successful marriages constitute the fundamental basis of the general welfare of the people.”
*82 In addition, Justice Douglas in Williams v. North Carolina I (317 U. S. 287, 298-299) stated: “Each state as a soverign has a rightful and legitimate concern in the marital status of persons domiciled within its borders. The marriage relation creates problems of large social importance. Protection of offspring, property interest, and the enforcement of marital responsibilities are but a few of commanding problems in the field of domestic relations with which the state must deal. Thus it is plain that each state, by virtue of its command over its domiciliaries and its large interest in the institution of marriage, can alter within its own borders the marriage status of the spouse domiciled there, even though the other spouse is absent.”
Faced with this overwhelming interest of the State in the marital relationship, an interest which our State still maintains even in a “ highly mobile era ’ ’, we should not discard the rule that jurisdiction over the subject matter of a divorce action requires a substantial relationship between the decree rendering jurisdiction and the marital res.
It is anomalous, indeed, that we are today upholding a one-day Mexican divorce decree while several of our sister States, which afford grounds for divorce not afforded by us, have refused to recognize such a decree. As recently as 1963, New Jersey, in Warrender v. Warrender (79 N. J. Super. 114, affd. on opn. below 42 N. J. 287), declared that a decree of divorce rendered in Juarez upon the personal appearance of the plaintiff and appearance by attorney of the defendant was void. The court observed that “ there is no basis for according greater recognition to a Mexican divorce on a one-day appearance than to the mail-order variety” (79 N. J. Super. 118).
In 1940 the Ohio Court of Appeals had occasion to rule on the bilateral Mexican divorce (Bobala v. Bobala, 68 Ohio App. 63). Having analyzed the problem along the lines of subject matter jurisdiction, concluding that the Mexican court was not possessed of such jurisdiction, and determining that the consent of the parties could not confer it, the court held that comity would not be extended.[2]
*83 Professor Babel observes that in spite of the many concepts of jurisdiction which the different systems of jurisprudence espouse, one condition required by all when they concern themselves with the recognition of foreign judgments of divorce overshadows all differences, ‘ ‘ viz, that the court of judgment must have had jurisdiction in the international sense, i.e., according to the conceptions of the forum where recognition is sought ” (1 Rabel, The Conflict of Laws: A Comparative Study [2d ed., 1958], p. 531). This court has unequivocally embraced the principle of jurisdiction in the international sense when we required the invocation of the jurisdiction of a foreign court “as we understand those terms” (Caldwell v. Caldwell, 298 N. Y. 146, 150). In that case we held that where neither spouse was before the court, a divorce rendered by a Mexican court which had acquired personal jurisdiction over both parties by virtue of the appearance of two properly empowered Mexican attorneys was void. However, I cannot emphasize too strongly that the decree was valid in Mexico. In other words, a decree may be valid where rendered yet not be entitled to recognition in New York, if it offends our public policy. (Caldwell v. Caldwell, 298 N. Y. 146, supra.)
As this court noted in Caldwell (p. 150): “ There is not even the slightest semblance or color of jurisdiction justifying action by a court. The spouses here never submitted themselves to nor invoked the jurisdiction of a court of a foreign nation as we understand those terms. They violated our statute embodying our public policy (Domestic Relations Law, § 51). Their collusive agreement and conduct may not be the foundation for the creation of any rights.” (Emphasis supplied.)
Since we in New York recognize the acquisition of personal jurisdiction by the personal appearance of a properly authorized attorney, and since Caldwell unequivocally denounces the lack of jurisdiction “ as we understand those terms ”, that ease must, of necessity, denounce the lack of jurisdiction (“ as we understand those terms ”) over the subject matter of the action, i.e., the marital res, as fatal.
Therefore, under the well-grounded concepts of jurisdiction over the subject matter, and jurisdiction in the international sense as delineated by Babel and as embraced by this State (until today) in Caldwell (supra), and relying upon Caldwell *84 itself, I would hold that it is against the public policy of New York to recognize the divorce decree of a foreign nation when such decree is not based upon jurisdiction over the subject matter, i.e., when there is no relationship of any degree of permanence between the marital res and the decree rendering jurisdiction. ■ Obviously, the interest and concern which New York has in the marriage of its citizens are infinitely greater than Mexico’s. I am unwilling to hold that, although our public policy is violated when a husband and wife execute powers of attorney and mail them to Mexican attorneys, it is not violated when one spouse, armed with the other’s power of attorney, makes a momentary physical appearance in Juarez, which, in the language of the majority, is nothing more than “ ephemeral ”.
I am convinced that, with the decision in this case, this court has rekindled the spark still burning in the breasts of some that so-called Mexican mail-order decrees may one day be recognized as valid in this .State. I agree with the Chief Judge that there is no distinction of substance between mail-order decrees and the decrees which have received the stamp of approval in the cases before us. Indeed, if the Mexican courts are jurisdictionally empowered to sever the matrimonial bonds of New York residents upon what the majority concedes to be a most flimsy jurisdictional basis, I fail to see why they are not jurisdictionally empowered to sever those bonds by mail with the virtue at least of its resultant economic benefit of avoiding the necessity of even a one-day trip.
In the briefs, great reliance was placed upon the following statement in Matter of Rhinelander (290 N. Y. 31, 36-37): “ It is no part of the public policy of this State to refuse recognition to divorce decrees of foreign states when rendered on the appearances of both parties, even when the parties go from this .State to the foreign state for the purpose of obtaining the decree and to obtain it on grounds not recognized here. (Glaser v. Glaser [276 N. Y. 296], supra, p. 302.) ” This statement can afford the respondents little comfort because it does not address itself to the situation, as in the case at bar, where the rendering court lacks subject matter jurisdiction as we know it. Once such jurisdiction is posited, the statement is true. The citation to Glaser v. Glaser (276 N. Y. 296) bears out this view because, in Glaser, the New York trial court found as a fact that defendant “ * duly *85 became a resident of the State of Nevada ’ ” (p. 299), thus giving Nevada a jurisdictional predicate upon which to act.
In my opinion, recognition should not be given to the decree of any foreign country affecting the marital status of New York domiciliarles where the plaintiff in the decree granting country did not and never intended to sever his ties with this State unless, as in Gould (supra), he had very substantial ties in that country. I say this not because I feel that there is anything sacred about the concept of domicile, but because I feel that there is something sacred about marriage; and because I feel that no foreign country has, or should bo recognized as having, the power to dissolve such a relationship between New York citizens when, in no inconsiderable number of cases, the irreparably destructive effects of such dissolution are to be borne in part by all of the people of this State and because I feel that the public policy of this State, which has remained unchanged these many years, absolutely compels us to refuse to acknowledge the existence of such power in any foreign country.
I agree with the majority that “ our public interest is not affected differently by a formality of one day than by a formality of six weeks ” and that u Nevada gets no closer to the real public concern with the marriage than Chihuahua” (p. 73). But — and this distinction is crucial — in the case of a sister State we are compelled to give full faith and credit to its decrees. In the case of a foreign country we are not compelled to do so and should not voluntarily recognize its decrees.
So-called “ realities of life” and “ contemporary experience”, assuming that such considerations may be accurately assessed, which I doubt, are not reliable bases for determining public policy. That some, perhaps many, choose to treat their marriage contract with the same indifference that they would a commercial contract does not mean that we should indorse such ■ conduct.
In addition to abandoning the requirement that a court which affects the marital status of our citizens should have subject matter jurisdiction, the majority has chosen to ignore the basic concepts and value judgments which permeate our Domestic Relations Law. The Legislature has seen fit to permit divorce in this State only because of the adultery of the defendant (Domestic Relations Law, § 170). This is certainly indicative *86 of a design to restrict the availability of divorce and in so doing to preserve the family unit. Such preservation is considered vital and indispensable to the welfare and stability of the family, the ultimate goal being a climate conducive to the better development of our society. This court has a duty not to sanction the casual and consensual dissolution of the marriage contract by two of the three parties interested therein. This is especially true in light of the clear public policy announced in section 5-311 of the General Obligations Law, and in Viles v. Viles (14 N Y 2d 365). To recognize these divorces is to disregard the traditionally solemn nature of the marriage contract (see Fearon v. Treanor, 272 N. Y. 268, supra), legislative pronouncements (e.g., Domestic Relations Law, § 170; General Obligations Law § 5-311), and decisions of this court (e.g., Viles v. Viles, supra; Caldwell v. Caldwell, 298 N. Y. 146, supra).
I am fully aware that a vast number of our citizens, relying upon the pronouncements below, have remarried, established families, acquired property, and engaged in many activities, personal and financial, as husband and wife. To accord this decision traditional retroactive effect would indeed have a profoundly convulsive and disruptive effect on our State, and on our citizens, who acted in good faith reliance on the law as enunciated below. However, to hold this divorce valid merely because our lower courts have been recognizing similar ones as such, and because many have placed reliance on those decisions, is no answer to the public policy considerations presented in this case. If this divorce is void, we should say so regardless of these prior decisions in our lower courts.[3] Nonetheless, I also recognize that there are public policy considerations which should be taken into account concerning parties who have already obtained such divorces in reliance upon those decisions. Therefore, again as a matter of public policy, I would hold that, although Mexican divorce decrees of this type are void, this decision should not be applied retroactively. It is certainly within our power as the highest court in the State to give a decision such effect and not violate the Federal Constitution (Great Northern Ry. v. Sunburst Co., 287 U. S. 358, 364). I *87 point out that this is a case where there are overriding and compelling reasons of public policy for refusing to give retrospective effect. I note that no one is being injured and no established rights are being impaired by such a disposition.
The doctrine of prospective application is a device which I believe should be invoked only in the most compelling circumstances. Such circumstances are here presented. The doctrine has been applied in Michigan (Parker v. Port Huron Hosp., 361 Mich. 1), when the court renounced charitable immunity for nonprofit hospitals, noting: “we believe the new rule should apply to the instant ease and to all future causes of action arising after September 15, 1960, the date of the filing of this opinion ” (361 Mich., p. 28). The Illinois court had occasion in Molitor v. Kaneland Community Unit Dist. No. 302 (18 Ill. 2d 11) to take the same approach in a similar immunity case, i.e., school districts were held liable in negligence to the plaintiff therein and to future plaintiffs. Wisconsin too, motivated by deep considerations of public policy, saw fit to abolish immunity of charitable hospitals prospectively only and to follow Molitor in giving the litigants then before the court the benefit of the ruling. (Kojis v. Doctors Hosp., 12 Wis. 2d 367.)
In sum, for reasons of public policy, I would give this decision prospective effect only but would permit the appellants here to reap the benefits of the appeal for the reasons aptly set forth in Molitor v. Kaneland Community Unit Dist. No. 302 (18 Ill. 2d 11, 27-28, supra): 1 ‘ Likewise there is substantial authority in support of our position that the new rule shall apply to the instant case. (Dooling v. Overholser, (D. C. cir.) 243 F. 2d 825; Shioutakon v. District of Columbia, (D. C. cir.) 236 F. 2d 666; Durham v. United States, (D. C. cir.) 214 F. 2d 862; Barker v. St. Louis County, 340 Mo. 986; 104 S. W. 2d 371; Farior v. New England Mortgage Security Co., 92 Ala. 176, 9 So. 532; Haskett v. Maxey, 134 Ind. 182, 33 N. E. 358; Daucey v. Farney, 173 N. Y. Supp. 530.) At least two compelling reasons exist for applying the new rule to the instant case while otherwise limiting its application to cases arising in the future. First, if we were to merely announce the new rule without applying it here, such announcement would amount to mere dictum. Second, and more important, to refuse to apply the new rule here would deprive appellant of any benefit from his effort and expense in *88 challenging the old rule which we now declare erroneous. Thus, there would be no incentive to appeal the upholding of precedent since appellant could not in any event benefit from a reversal invalidating it.” This view was adopted by the Wisconsin Supreme Co art in Kojis v. Doctors Hosp. (12 Wis. 2d 367, 374, supra). Of course, parties to cases which have already been decided and which have already upheld their divorces could obtain no benefit from the consideration afforded these appellants (Lyon v. Richmond, 2 Johns. Ch. 51, 59, per Kent, Ch., revd. on other grounds 14 Johns. 501).
The order of the Appellate Division vacating the judgment of annulment and reinstating Mrs. Rosenstiel’s injunction action restraining Mr. Rosenstiel from seeking marital relief outside this jurisdiction should be reversed.
In Wood v. Wood decided herewith, I would modify the order of the Appellate Division to the extent of granting the defendant’s counterclaim for annulment. In all other respects I would affirm.
Judges Dye, Fuld and Van Voorhis concur with Judge Bergan; Chief Judge Desmond concurs in part in an opinion; Judge Scileppi dissents and votes to reverse in an opinion; Judge Burke taking no part.
In each action: Order affirmed.

. For a discussion of this case including comments by scholars in the area consult 1 Rabel, The Conflict of Laws: A Comparative Study (2d ed., 1958), p. 531.

. Compare Golden v. Golden (41 N. M. 356) with Ferret v. Ferret (55 N. M. 565).

. In this connection we should recall that this is the first time that we have had this question before us, and that this court has no power to issue advisory opinions.