5. Samuel Di Falco, S.
The widow of the testator, having filed an election to take against his will, petitions the court to declare that she is entitled to take her elective share. Under the will and first codicil she is given the income of a trust consisting of 55% of the residue of an estate which is said to have a gross value in excess of $7,000,000, but the value of her legacy *925 is not one of the issues here. The executor’s answer pleads an antenuptial agreement in which the petitioner expressly waived any right to elect to take against this particular will or any other will of this testator. In reply the petitioner contends that (a) the antenuptial agreement is void because it tends to promote or facilitate the dissolution of a marriage (viz., that of the testator and his former wife); (b) the testator lacked legal capacity to enter into an antenuptial agreement with petitioner because at that time he was married to another woman; and (c) the agreement was obtained “ through the overreaching of your petitioner and in fraud of her rights at a time and under circumstances when she lacked independent advice and counsel. ’ ’
The facts relating to the first ground of attack upon the agreement are mainly undisputed. The testator had been married three times. The dissolution of his first marriage is not relevant here. He and his second wife, Dorothy, separated some time prior to April 3, 1953 (the date they entered into a separation agreement) and they never afterwards resumed living together. The petitioner had served the testator as a registered nurse. In August, 1965, the testator was 80 years of age; the petitioner, 40 years old. Some months prior to August they presumably made arrangements to intermarry, the exact details of which are not disclosed, principally because of the bar of CPLR 4519.
The antenuptial agreement is dated August 13, 1965, was signed and acknowledged by the petitioner on August 13 and by the decedent on August 17. It recites that the two parties contemplate marriage when Mr. Fleischmann “ [who is presently married] is free to do so.” Discussions about a divorce had been going on prior to this time between the attorneys for the husband and the attorney for the then Dorothy Fleischmann. The antenuptial agreement was executed by the testator on the very .same day and at the very same time as a special power of attorney in which he authorized a Mexican attorney to represent him in a divorce action ‘ ‘ instituted or to be Instituted ’ ’ by his wife. The divorce action was instituted four days later, on August 21,1965, and the decree of divorce is dated August 23, 1965. The testator and the petitioner were married in London on October 25,1965.
It is petitioner’s contention that the antenuptial agreement contained an implied promise on the part of the testator that he would divorce his wife, that the agreement is thus conditional upon his procuring the dissolution of a then subsisting marriage, and is consequently against public policy and void in all respects. She maintains that the negotiations for the divorce and for the *926 antenuptial agreement were carried on during the same period and must be viewed as parts of an over-all plan, as a result of which the testator did promote and facilitate the dissolution of his marriage to Dorothy Fleischmann (now Dorothy La Marche).
There is no doubt that the testator did promote the divorce proceedings, with the consent and co-operation of his then wife, and it would seem probable that he did so in order to be free to marry the petitioner. We are not concerned, however, with the validity of any agreement made by the testator and Dorothy Fleischmann or with the enforcement of any promises that may have been exchanged between them. There is no evidence that any formal agreement or exchange of promises was made by them. The subsequent marriage of Dorothy would indicate that a divorce was mutually desired, but their mutual arrangements are not material here. The antenuptial agreement is wholly separate and apart from any arrangement or agreement made by the testator with anyone else. Our concern is only with that antenuptial agreement between the petitioner and the testator and, of course, such surrounding facts and circumstances as add to or diminish the meaning of its terms.
The policy of this State has always been in favor of the preservation of the marriage relation, and contracts which have a direct tendency to promote a divorce have always been condemned as contrary to public policy. (Hettich v. Hettich, 301 N. Y. 447; Matter of Rhinelander, 290 N. Y. 31; Schley v. Andrews, 225 N. Y. 110, 113; Lake v. Lake, 136 App. Div. 47; Restatement, Contracts, § 586.) That policy found expression in our statutes, originally as a priviso to the Married Women’s Act (L. 1892, ch. 594, amdg. L. 1884, ch. 381), later incorporated in the Domestic Relations Law (L. 1896, ch. 272, § 21; L. 1909, ch. 19, § 51), now in the General Obligations Law (§ 5-311, as amd. by L. 1966, ch. 254, § 12). The Court of Appeals has said: ‘1 This Court has never hesitated to enforce that statute and to strike down any agreement fairly within its intendment. * # * 'Some of the New York cases have gone beyond the letter of the statute (Domestic Relations Law, § 51), which refers in terms only to a ‘ contract to alter or dissolve the marriage ’ and have refused sanction to agreements which diyeetly tended toward such a dissolution. But our progress iii the direction of broadening the coverage of section 51 has gone no further than to apply that section* and its policy, to agreements which have a direct tendency toward dissolving marriages.” (Matter of Rhinelander, supra, pp. 37, 38.)
*927 The agreement before the court in the Rhinelander case was held not to have a direct tendency toward dissolving a marriage in which a permanent separation began one month after the ceremony. The ensuing years brought litigation by both parties. In the course of little more than one year, the husband obtained a decree of divorce in .Nevada based upon service by publication, the wife sued her father-in-law (the testator) for alienation of affections, and she instituted an action in New York for a separation. All of their lawsuits were adjusted in agreements in which the husband promised to make annual payments for the support of the wife, and the testator guaranteed the payments. However, these payments were conditioned upon the wife’s taking any one of three steps, any of which would result in making her a party to the Nevada divorce action. The agreements were signed, but were never delivered to the wife until she had made a formal appearance in that action and obtained a modification of the decree so as to award support to her in the sums provided in the agreements (which though signed, had not been delivered). The court found as a fact that the real intent of the parties was that the agreements would not have been delivered had not the Nevada decree been reopened on the wife’s petition and the support agreement incorporated in that decree, and it also found that in substance what the wife did was to agree to give the Nevada decree the same force and effect as if it had originally been obtained upon her appearance. Nonetheless the Court of Appeals ruled that although a contract is void Which binds a party to do something that is contrary to our public policy, “ the contract here did not, in terms or in meaning, so bind anyone.” (Matter of Rhinelander, supra, p. 39.) This conclusion was made despite acceptance of the lower court finding that the agreements were being withheld from the wife pending her giving to the divorce decree the appearance of due process of law.
Butler v. Marcus (264 N. Y. 519) is another ruling that a contract which does not directly tend toward dissolution of the marriage, is valid. There the parties had entered into a separation agreement which provided for generous payments to the wife but also provided that in the event the parties were still united in marriage at the end of the year, all of the terms and promises would cease to be binding upon either of them. If, however, either party obtained a divorce from the other before the year’s end, the agreement would continue in full force. The wife did obtain a decree of divorce within the time specified, the husband failed to make the promised payments, and suit was *928 brought on the agreement. One of the defenses interposed by the husband was that the agreement was contingent upon dissolution of the marriage and was therefore void. Summary judgment striking out that defense as insufficient in law was granted and affirmed on appeal. The validity of a contract was also upheld in Abeles v. Abeles (197 Misc. 913) upon a very similar fact pattern.
On the other hand, a collateral oral agreement was held to have a direct tendency to dissolve the marriage in Viles v. Viles (14 N. Y 2d 365) and the written agreement was there ruled invalid.
In the sharply divided decision, the majority found the evidence to be sufficient to support the finding that the wife’s oral agreement to obtain a divorce was a condition to the execution of the written contract by the husband. The Court of Appeals ruled that the collateral agreement “had a direct tendency” to dissolve the marriage (supra, p. 367).
The contracts in all of these cases were geared toward a divorce, and patently had some tendency to promote the divorce, or the perfecting of an infirm divorce decree. But in all but the Viles case, the court held that the agreement had no direct tendency to disrupt the marriage relation, and for that reason refused to condemn it.
The judicial declaration of public policy which draws a distinction between contracts that have a direct tendency to destroy a marriage and those which have only an incidental relation to a divorce, finds confirmation in the 1966 amendment to the statute (L. 1966, ch. 254, § 12; General Obligations Law, § 5-311). A new sentence was added to the existing text, reading as follows: ‘ ‘ An agreement, heretofore or hereafter made between a husband and wife, shall not be considered a contract to alter or dissolve the marriage unless it contains an express provision requiring the dissolution of the marriage or provides for the procurement of grounds for divorce.” That amendment was part of the statute which liberalized divorce in New York State. The statute speaks only in terms of an agreement between husband and wife, but the decisions always extended that principle to agreements between one spouse and a third person. The 1966 amendment thus serves to confirm the judicial expression of public policy in the Rhinelander and Butter cases.
The antenuptial agreement in this case is not complex. The only mention of the marriage is in the recital quoted above which referred to the testator’s then incapacity to contract a new marriage. The petitioner waived any right to share in the estate *929 or to elect to take against the will of the testator dated January 26, 1965 (or any other will), and in consideration of that promise the testator agreed that he would not make any testamentary provision that would adversely modify the provision which had been made for her in that will or that if he should revoke that will, he would execute a new will which would contain a substantially similar provision for her. That will (which has now been admitted to probate) gives her the income from 50% of the residuary estate (later increased by codicil to 55%). The only provisions in the will which encroach upon the residuary estate are one for his former wife which carries out the terms of the separation agreement of 1953 and a general legacy to a friend in the sum of $100,000. The petitioner’s legacy refers to her merely as a friend (the will having antedated the marriage by some months) but the codicil reflects her status as wife. Petitioner thus had interests under the will which were not dependent upon her marriage to the testator. Nothing in the antenuptial agreement bound the testator to procure a divorce. Nothing bound either party to marry the other. The agreement did not have a direct tendency to destroy the testator’s then subsisting marriage, and the court holds that the agreement is not invalid as one directly tending to alter or dissolve the marriage.
The second point made by the petitioner also challenges the legality of the agreement, charging that it is void “ because a married person lacks the contractual capacity to enter into an agreement with a third person in contemplation of marriage notwithstanding that the performance is conditioned upon the ability to obtain a divorce or the death of his spouse.” It is a well-settled principle of law that a contract to marry by one who is already married, is contrary to public policy and is void. (Haviland v. Halstead, 34 N. Y. 643; Lowe v. Quinn, 32 A D 2d 269, 271; Sweinhart v. Bamberger, 166 Misc. 256, affd. 254 App. Div. 665; Levin v. Levin, 253 App. Div. 758; 6 Williston, Contracts [rev. ed.], p. 4935; 6A Corbin, Contracts, § 1475; Restatement, Contracts, § 588.) The petitioner speaks of lack of contractual capacity. There is not in reality a lack of capacity to make a contract, but rather a ‘1 lack of capacity to marry at the time of contracting ’ ’ (Dean, Economic Relations Between Husband and Wife in New York, 41 Cornell L. Q. 175, 182). However, the invalidity of such an agreement does not rest on such a narrow ground but is generally said to result from its contravening public policy. (6 Williston, Contracts, supra, p. 4935; 6A Corbin, Contracts, supra, § 1475; Restatement, *930 Contracts, § 588.) The precise policy which such an agreement offends is one that finds expression in the decisions rather than in a statute and quite naturally it is somewhat differently stated by different Judges. (See Fender v. St. John-Mildmay [1938] A. C. 1, 14-17, 24-26, 32-33, 42-44, 52-53; Spiers v. Hunt [1908] 1 K. B. 720, 724-725; Paddock v. Robinson, 63 Ill. 99; Noice v. Brown, 38 N. J. L. 228, 229, affd. 39 N. J. L. 133.) The consensus seems to be, however, that the agreement to marry another is an offense against the existing marriage and against the duty of loyalty by one spouse to the other and to the marriage itself. It may, perhaps, additionally be regarded as promoting divorce (Dean, Economic Relations Between Husband and Wife, supra), or as leading to immorality (Fender v. St. John-Mildmay, supra, pp. 15, 32). But in all of these cases it is the promise to marry another that is the essence of the offense against public morals and public policy. Lacking an express promise in the agreement now before the court, it would be unreasonable for us to imply such a promise when such an implied promise would be unlawful and the effect of such an implication would be to render the agreement invalid. It is not unreasonable to suppose that the two parties had reached some understanding of their mutual hopes and desires. The agreement says that both of them ‘ ‘ contemplate marriage when [Raoul Fleischmann] [who is presently married] is free to do so.” But it did not pretend to bind either of them to do so, and it made dispositions which could be effective whether or not they married, although these dispositions were intended also to govern their property rights if in fact they did marry. The mutual waivers of the right of election were, of course, intended to be operative only if there were a right to elect, which in turn would arise only from a valid marriage. The agreement looked to the future, but it envisioned more than the one future situation.
In the absence of any promise to marry by either party, there can be no more illegality in an agreement fixing property rights than in a separation agreement which fixes property rights. In the one case it would be the promise to marry by one already married that infects the contract with illegality, and in the other, promises to separate by married persons not yet separated. When the invalid promise is absent, provisions defining property rights and interests are not deemed illegal and immoral.
There is another reason why petitioner is not entitled to the relief which she seeks. She has come into a court of equity to assert a right to elect to take against the will of her husband, *931 a right which would flow from a valid and lawful marriage. She asks the court to disregard her waiver of that right which is clearly set forth in the antenuptial agreement. A valid and lawful marriage between the parties followed the agreement. There has been full performance of the terms of the agreement on the part of the testator. The petitioner does not seek to rescind the entire agreement. Indeed, this is the type of contract Avhere it is impossible to put the parties in status quo. (American Sur. Co. v. Conner, 251 N. Y. 1, 9; 2 Williston, Contracts [3d ed., Jaeger], p. 161.) This is not a case, moreover, where there is an innocent party and a guilty one. Guilt, if there be any, rests on both parties equally. What petitioner seeks is to take for herself all of the financial benefits of the marriage and to deny to her husband, or to his personal representative, the limitations which she agreed to place upon property rights arising out of the marriage.
An illegal bargain is not necessarily a void one. (Restatement, Contracts, § 598, comment a.) If it were void, even an innocent party would have no redress. What the law does is to refuse to lend its aid to a party seeking to enforce a promise which offends public policy. (Holman v. Johnson, 1 Cowp. 341, 343; 5 Williston, Contracts [rev. ed.], § 1630.) Where, however, a transaction is fully executed, although it originated in an agreement, the executed transaction is effectual. (American Sur. Co. v. Conner, 251 N. Y. 1; 5 Williston, Contracts [rev. ed.], p. 4574.) Here the parties were lawfully married, the testator not only carried out his promise to maintain the testamentary provision for his wife but he even improved it, and the wife duly waived her right to elect to take against his will. Even if the illegal promise could be implied in the present contract, equity should leave the parties where it finds them. (Schley v. Andrews, 225 N. Y. 110, 113.) The relief which petitioner can expect from a court of equity must be moulded upon principles of equity and justice. Both equity and justice demand that petitioner honor the promises which she made in order to bring about the marriage.
The final challenge to the antenuptial agreement is that it was procured by fraud, overreaching and deception and that it is unfair and inequitable, that petitioner was not represented by independent counsel of her own choice, and was not fairly advised of her rights or of the effect of the waiver. The petitioner was represented by independent counsel. What she is actually charging is that her attorney was chosen by counsel for the testator, that the two firms had prior business relationships and that her attorney was interested in completing the *932 agreement rather than giving independent counsel to petitioner.
The court finds that there is no merit to the charge that the petitioner was not fairly represented hy independent counsel. The testimony of the attorney for the testator and the attorney for the petitioner satisfies the court that both attorneys acted responsibly, ethically and fairly. The petitioner had called Mr. Hetkin, the testator’s attorney, on another matter and at the end of that conversation Mr. Hetkin mentioned the ante-nuptial agreement. He said that he could not act as her attorney with respect to that agreement and asked if she had counsel of her own. Her answer being in the negative, he asked if she would care to consult with an attorney whose name he would suggest. She assented to that proposal. Mr. Hetkin communicated with Mr. Blanc, who was a member of an entirely different firm and who had no connection at all with the testator or the Hetkin firm, except that each firm had in past years referred to the other a few matters in which the other had greater experience. The petitioner conversed with Mr. Blanc by telephone, made an appointment to confer with him, came to his office at the appointed time, and on the same afternoon signed the agreement.
There is a sharp conflict in the testimony between petitioner, on the one hand, and the two attorneys, on the other, with respect to what each one told her. Some of the testimony of the petitioner is incredible. Her testimony that Mr. Hetkin told her that “it’s necessary that you sign [the antenuptial agreement] in order for Raoul to get a divorce ” is difficult to accept. No matter how naive she then was, she would hardly believe that one could not get a divorce unless there was another ready to marry him. Nor can the court accept her version of Mr. Hetkin’s declaration to her: “ Please, by signing it, don’t think you are giving anything up. On the contrary, you are not in the least.” The attorney emphatically denied making any such statement. It is inconceivable that any lawyer would make such a statement in the context in which it was said to have been made.
The petitioner made it clear to Mr. Blanc that she was 11 sure ’ ’ that she would sign the agreement. She also told him that she had no intention of contesting a will of her intended husband. The circumstances make understandable her then attitude toward the transaction. A lady half the age of the decedent, employed as a nurse and without independent resources of her own, was named as a beneficiary in the will of her employer of a trust fund that her attorney complains consisted of “at the most (after deducting taxes) $1,320,000.” Despite the present contention of her counsel that Mr. Blanc should have tried to get *933 a better ‘ ‘ deal ’ ’ for her, it is patent that she was not then in a position to bargain for a larger share of the estate, and, in fairness to her, it must be said that she was not then .seeking a better ‘ ‘ deal ’
The court is satisfied- that the petitioner was given a fair explanation of what would be her rights if she married the testator, what the nature of her legacy was, and that she was waiving certain rights that she would have if it came to pass that she survived the testator as his wife. It is true that the attorney did not attempt to tell her in dollars what the respective interests would be, nor did he attempt to determine the amount of estate taxes that would be payable. The testator’s assets consist largely of shares of stock in the New Yorker magazine. The valuation of that stock and the treatment of his obligation to his former wife under their separation agreement would have results in the estate tax proceedings that would be difficult to predict. The petitioner was advised that there could be a substantial difference between her intestate share and her trust benefits, but she herself recognized that she was not yet married to the testator and that the marriage was not definitively settled.
It is unnecessary to discuss all of the charges of the petitioner or the evidence on both sides. The court finds that the agreement was made without fraud, overreaching, deception or other inequitable conduct on the part of the testator or his attorneys. The court holds that the antenuptial agreement is in all respects valid and that the waiver of the right of election by the petitioner is valid and effective. The petitioner has no right to elect to take against the will of the testator.