ELIZABETH SWEINHART, Plaintiff, v. LOUIS BAMBERGER, Defendant.*

Supreme Court, Special Term, New York County, December 2, 1937.

* Affd., 254 App. Div. ——.

*Frank Aranow* [*Sydney A. Hellenbrand* and *Charles S. Corben* of counsel], for the plaintiff.

*Garfield & Wrubel* [*Edward Garfield* and *Robert H. Wrubel* of counsel], for the defendant.

SHIENTAG, J. This is a motion to strike out affirmative defenses, with a cross-motion by the defendant for summary judgment.

The complaint alleges that in 1916 the defendant orally promised to marry the plaintiff " at a time thereafter to be mutually agreed upon," but that he refused to do so " although plaintiff was ready, able and willing and offered to do so up to and including the time the defendant failed and refused to marry the plaintiff." Thereafter, the complaint goes on, the defendant, in consideration of the release of plaintiff's claim for breach of promise, orally promised to support her " according to her station in life, as though she were his wife, and according to his means and station in life, for the rest of her life." The defendant allegedly performed the agreement until February, 1933, but has since failed to do so to the plaintiff's damage, it is claimed, in the sum of $1,000,000.

The answer, in addition to a general denial, pleads as an affirmative defense that in 1916 the plaintiff was prevented from marrying by a valid decree of divorce granted by the Supreme Court of this State to her former husband, which forbade her remarriage during

her former spouse's life, and that any agreement of marriage entered into between the plaintiff and defendant at that time was illegal and void. The provision against remarriage was incorporated in the decree pursuant to the New York statute which forbade the remarriage of the guilty party during the lifetime of the former spouse, unless the court should modify the decree in that respect upon satisfactory proof that five years have elapsed since its rendition and that the conduct of the guilty consort has since then been uniformly good. (Dom. Rel. Law, § 8.) The answer further pleads as a second affirmative defense that, because the promise to marry was illegal and void, there was no consideration for the alleged agreement to support for life.

Pursuant to an order of the court the plaintiff served a verified bill of particulars setting forth the substance of the words of promise. Nowhere in the bill does anything appear to indicate that the promise was anything other than an absolute promise to marry. In her affidavit submitted on the motion for summary judgment the plaintiff for the first time states that the promise was to marry after she had secured the permission of the court to do so. She claims that the defendant at all times knew of the divorce proceedings and the terms of the divorce decree; that, in fact, the defendant, after consulting his attorneys, told her she could make an application to remarry that "would undoubtedly be granted;" that he assured her that his attorneys would make the application at the proper time and that then they would marry. It may be noted parenthetically that the plaintiff never secured the removal of the ban against her remarriage, and that the divorce decree is still in force as it was originally entered. The defendant denies the statements in the plaintiff's affidavit, and in addition asserts that the moneys he paid the plaintiff up to 1933, upwards of $1,250,000, were extorted from him.

Were these alleged contracts to be judged by the public policy of this State as it exists today, no action could be maintained upon either of them. The Legislature has abolished civil actions to recover damages for breach of promise to marry (Civ. Prac. Act, §§ 61-b, 61-d), has declared any contract executed in settlement of such a cause of action void as against public policy (Civ. Prac. Act, § 61-f), and has declared void every oral agreement "the performance of which is not to be completed before the end of a lifetime." (Pers. Prop. Law, § 31.) These statutes were passed to correct abuses that had for many years surrounded contracts such as those in suit. (Civ. Prac. Act, § 61-a.) Contracts of these types are peculiarly subject to fraudulent manipulations by unscrupulous persons, and actions brought upon them have always been scrutinized closely by the courts. (See *Fearon* v. *Treanor*, 272

N. Y. 268.) This judicial attitude has developed into the policy of the State as declared in the statutes described above. However, these statutes have no retroactive effect, and the contracts in issue are to be judged solely by the public policy that prevailed at the time they were made. (Civ. Prac. Act, § 61-c; *Fearon* v. *Treanor*, *supra; Fredenburg* v. *Fredenburg*, 159 Misc. 525.)

It is unnecessary to consider whether the promise alleged in the complaint — to marry " at a time thereafter to be mutually agreed upon " — is sufficiently definite to serve as the basis for an action, and whether the promise stated in the plaintiff's affidavit — to marry after the removal of the prohibition — is unenforcible because performance is conditioned upon a contingency that may never occur. Even if such promises are unenforcible for these reasons, the relinquishment of the right to sue upon them, asserted in the honest belief that a cause of action exists, would be sufficient consideration for the contract sued upon, the agreement to support for life. (1 Williston on Contracts [1936], § 135, and New York cases there cited.)

The rule is otherwise, however, if the original agreement is illegal and void as being contrary to the public policy of the State. In such a situation, the original claim would have no color of right, and the forbearance to sue upon it would form no consideration for a subsequent agreement. (1 Williston on Contracts, [1936] § 135; Anson on Contract, [Corbin's ed., 1930] § 131; Clark on Contracts, [1914] § 71; *Moore* v. *Blanck*, 71 Misc. 257. See *Hammond Oil Co.* v. *Standard Oil Co.*, 259 N. Y. 312, 323; *Springstead* v. *Nees*, 125 App. Div. 230; *Lockwood* v. *Title Ins. Co.*, 73 Misc. 296; *Caruana* v. *Prudential Spice Co., Inc.*, 178 N. Y. Supp. 401.) A promise to do anything as a compromise or satisfaction of the illegal bargain would itself be illegal. (Restatement of the Law of Contracts, § 590; *Gray* v. *Hook*, 4 N. Y. 449; *Boyd* v. *Boyd*, 130 App. Div. 161; *Coffey* v. *Burke*, 132 id. 128.) Were the rule otherwise, the parties could by their private agreement waive the illegality and evade the prohibition against the original contract.

The important question to determine, then, is the legality of an agreement to marry made while one of the parties, to the knowledge of the promisor, is under a legal disability to perform, which disability may never be removed.

The pertinent portion of section 8 of the Domestic Relations Law, as it read in 1916, declared that " a defendant for whose adultery the judgment of divorce has been granted in this State may not marry again during the lifetime of the complainant, unless the court in which the judgment of divorce was rendered shall in that respect modify such judgment, which modification shall be made only upon satisfactory proof that five years have

elapsed since the decree of divorce was rendered, and that the conduct of the defendant since the dissolution of said marriage has been uniformly good.'' (See, also, Dom. Rel. Law, § 6.)

The precise wording of the New York statute does not appear to be duplicated in any other State. The statutory provisions in the other States are varied, but, although some of the other statutes resemble the New York law in broad outline, none has been brought to my attention which declares that a guilty party in a divorce action may not remarry during the life of the former spouse unless, after the expiration of a certain fixed period of time, the court lifts the ban. (See 2 Vernier, American Family Laws, [1932] § 92.) No New York case has placed a definitive construction on these statutory words in so far as agreements made during the continuance of the marriage ban are concerned. (Cf. *Matter of Wadsworth*, 100 Misc. 439; affd., 185 App. Div. 944, and *Kastner* v. *Stein*, 130 Misc. 840.)

Under a former New York statute which forbade the remarriage of the guilty party in a divorce action during the life of the former spouse with no means provided for removing the prohibition, it was held that an agreement to marry made prior to the death of the former spouse was illegal and void. (*Haviland* v. *Halstead*, 34 N. Y. 643 [1866].) Under statutes in other States, which permit the remarriage of the guilty party after the expiration of a definite period without application to any court, the agreement to marry made during the period of prohibition has been held to be valid and binding. (*Harpold* v. *Doyle*, 16 Ida. 671, 694; 102 P. 158; *Buelna* v. *Ryan*, 139 Cal. 630; 73 P. 466; *Morgan* v. *Muench*, 181 Iowa, 719; 156 N. W. 819; *Cooper* v. *Bower*, 78 Kan. 156; 96 P. 59; *Leininger Lumber Co.* v. *Dewey*, 86 Neb. 659; 126 N. W. 87; *Greenback* v. *Stewart*, 175 Okla. 500; 53 P. [2d] 542; Restatement of the Law of Contracts, § 588, Comment A. Cf. *Vunk* v. *Patterson*, 118 Ore. 602.) The New York statute under consideration is intermediate between these extremes — it is more liberal than the former statute interpreted in 1866 and stricter than those existing in the other States whose decisions have been cited. Which group of decisions is then to govern the construction of the statute we are here concerned with?

The marriage status has always been regarded with jealous eyes by the State, and attempts to impair the quality of the relation frustrated. Marriage is more than a civil contract, more than a mere personal relationship, and more than a mere economic device to regulate the proprietary rights of the persons concerned. Marriage is the foundation of the family and society, without which there would be neither civilization nor progress. It is an institution in the maintenance of which in its purity the public is deeply concerned.

The State has always exercised a full control over the marriage status. " Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the Legislature." (*Maynard* v. *Hill*, 125 U. S. 190, 205.) It has been regulated by laws based " upon principles of public policy affecting the welfare of the people of the State." (*Fearon* v. *Treanor*, 272 N. Y. 268, 272.) The marriage state, with its profound effect upon the happiness and well-being of future generations, is not to be entered into lightly nor participated in by those unfit to bear the social obligation the relation implies.

The Legislature has declared that certain classes of persons are disqualified from marrying, and that the marriages of other classes may be annulled. (Dom. Rel. Law, §§ 5, 6, 7.) It has seen fit to place in the first category the party to a divorce action who has been found guilty of adultery. The statute goes beyond the prevention of hasty divorces secured because of a desire to remarry immediately, and beyond the mere wish to punish the guilty party. It aims to protect the marital status by ascertaining to some extent the fitness of those seeking to re-enter the marriage state after violating its precepts, and it should be interpreted with this purpose in mind. (*Cropsey* v. *Ogden*, 11 N. Y. 228, 236.)

The Court of Appeals so regarded the statute when it made its determination in *Haviland* v. *Halstead* (*supra*). The statute in effect at that time prohibited the remarriage of a guilty spouse during the lifetime of the former consort. The Court of Appeals declared agreements to marry made while the guilty partner was under the statutory disqualification illegal and void, even though that disqualification might on a contingency be removed and a valid marriage then take place. The contingency that had to occur under that statute was the death of the former spouse prior to the marriage of the guilty consort. If such a contingency occurred the guilty party was free to remarry without more. All that the statute under consideration does is add a further contingency. The mere addition of this further contingency, with no substantial change being made in the pre-existing statutory language, cannot operate to change the public policy of this State regarding the agreement to marry. There is nothing to indicate that the Legislature intended such a change, and the statutory addition carries no such presumption with it. Something more must be shown to work a change in the public policy of the State.

The contrary *obiter dictum* of *Matter of Wadsworth* (*supra*) does not control the disposition of this case. Contrary to what was said in that case, there is no " sure way " of removing the ban imposed by section 8 of the Domestic Relations Law. (See *Rosen*

v. *Rosen*, N. Y. L. J. July 1, 1924, p. 1242; *Waas* v. *Waas*, 5 N. Y. Monthly Law Bull. 59.)

The insertion of a condition in the contract — that performance was to occur only after the removal of the ban (which might, in fact, never be removed) — does not make the contract legal. It is erroneous to reason that a contract to marry is necessarily legal if the act contracted for would not be unlawful at the time of its contemplated performance. Such is not the law. A rule of law such as that would validate every agreement to marry after a divorce is procured, made while one of the parties was married to the knowledge of the other. Yet such an agreement is illegal. (Restatement of the Law of Contracts, § 588; *Williams* v. *Igel*, 62 Misc. 354; *Noice* v. *Brown*, 38 N. J. L. 228; affd., 39 id. 133; *Leupert* v. *Shields*, 14 Colo. App. 404; 60 P. 193; *Johnson* v. *Iss*, 114 Tenn. 114; 85 S. W. 79. See *Spiers* v. *Hunt*, L. R. [1908] 1 K. B. 720; *Carter* v. *Rinker*, 174 Fed. 882; *Edelbaum* v. *Lustig*, 140 Misc. 854.) By the same token a marriage contract entered into by the guilty spouse before removal of the statutory prohibition against remarriage is illegal and void no matter when performance is to take place. (*Vunk* v. *Patterson*, 118 Ore. 602; 247 P. 766. See, also, *Overseers of Bridgewater* v. *Overseers of Brookfield*, 3 Cow. 299.)

One other point may be considered. The promise as set forth in the opposing affidavit of the plaintiff is so at variance with that alleged in the complaint and set forth in the bill of particulars as not to present a genuine triable issue of fact, but rather what has been aptly characterized as a " phantom issue " insufficient to defeat the remedy of summary judgment. (*Strasburger* v. *Rosenheim*, 234 App. Div. 544.) The words of the promise as now alleged are clearly an afterthought designed to avoid the effect of the decision of the Court of Appeals in *Haviland* v. *Halstead* (*supra*) and to bring the plaintiff within the purview of some new rule of law that she felt might be applicable to her case. Nothing was said in the bill of particulars about performance being conditioned on the removal of the statutory ban. Certainly this was a most important term of the promise, and its statement was called for by the order requiring the service of the bill. Moreover, any claim that the promise to marry was to be performed only when the statutory prohibition was removed is in direct conflict with the statement in the bill that plaintiff offered to marry the defendant in January or February, 1916 or 1917. The issue raised in the opposing affidavit is sham.

For the foregoing reasons the motion to dismiss the affirmative defenses is denied and the defendant's motion for a summary judgment is granted.