Royal T. **BROWN** and Ethel K. **Brown, Appellants,**

v.

William C. **BAKER** and Mary Jane **Baker, Appellees.**

No. 7428.

Supreme Court of Alaska.

Sept. 21, 1984.

---

Robert S. Spitzfaden, Smith, Robinson & Gruening, Anchorage, for appellants.

C. Michael Hough, Homer, for appellees.

Before BURKE, C.J., and RABINOW-ITZ, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

Royal and Ethel Brown appeal the judgment of the superior court granting summary judgment on liability and awarding attorneys' fees in excess of the statutory standard.

The Bakers brought an action against the Browns when the latter refused to return a limited entry permit after defaulting on a marine mortgage. The Browns had purchased the vessel STARBURST and a limited entry permit on credit. When they could not make the payments, the Browns returned the vessel; unknown to the Browns, the Bakers then resold the vessel. The Bakers sued for return of the permit and damages. The Browns and Bakers entered into a settlement agreement which provided that the Bakers would drop their suit if the Browns returned the permit, dropped their counterclaim, and paid damages. However, the Browns refused to honor the settlement agreement and the Bakers amended their complaint to include a count for breach of the agreement. The superior court granted summary judgment on that count. For the reasons below, we reverse and remand for trial on the issue of the surplus realized by the Bakers upon resale of the vessel.

## I. *Factual Background*

On June 6, 1977, Royal and Ethel Brown purchased the vessel STARBURST, some fishing gear, and a Prince William Sound Limited Entry Permit from William and Mary Baker for the sellers' asking price of $275,000. The Browns paid $75,000 down. A promissory note was secured by a $200,-000 Preferred Mortgage on Vessel and incorporated into the marine mortgage. At the bottom of the original of the promissory note was the language:

> If default be made Royal T. Brown and Ethel K. Brown will return the Alaska Entry Permit No. S01E 59399E to William C. Baker.

The Browns claim that they, in the presence of the Bakers, cut this provision from the bottom of the promissory note.

The Browns were unable to make the payments on the mortgage. They requested that the Bakers take back the STARBURST. On June 23, 1978, the Browns reconveyed the STARBURST to the Bakers and executed a Bill of Sale of Registered Vessel. The Bakers prepared a Satisfaction of Mortgage.

Mr. Baker requested the permit back. Mr. Brown stated he believed that Baker needed the permit back so that he could sell the STARBURST. Allegedly, the Browns orally agreed to return the permit to the Bakers. Although Baker had not previously expressed an intention to fish commercially, he fished the 1978 season on Brown's card. Prior to the 1979 fishing season, the Browns conveyed the permit to their son Malcolm, at that time a resident of Cordova. He paid his parents $35,000 for it.

On January 3, 1979, the Bakers sold the STARBURST to Mr. Robert J. Hendrichs for $240,000. The buyer did not need the permit, as he already owned one. The Bakers did not tell the Browns or their attorney that they had sold the STARBURST.

On February 27, 1979, the Bakers filed suit claiming damages to the STARBURST, loss of income, and demanded return of the limited entry permit. The Bakers claimed that the Browns orally agreed to transfer the permit but neglected to do so.

The Browns answered and counterclaimed. They denied making an agreement, and admitted that they had not transferred the permit to the Bakers. They further asserted that Baker had assured them that he had numerous firm fisheries contracts which would inure to their benefit, and that the gear on board and instructions on fishing were included in the purchase price. They alleged that they purchased the STARBURST in reliance on these representations and that none of them materialized. They also claimed that Baker had assumed certain obligations for improvements made to and secured by the STARBURST when he retook possession of the vessel.

No proof of the various claims and counterclaims was offered at trial since, on January 28, 1980, the Bakers and Browns entered into an agreement in an effort to settle their case out of court. The settlement agreement was filed with the court on February 7, 1980. It was signed by

both parties and their respective attorneys, C. Michael Hough and Robert Opland. The settlement agreement reads in part:

The parties stipulate that they will dismiss the above-captioned case upon the following terms and conditions:

. . . .

(3) Defendants shall transfer to Plaintiffs or their assigns a State of Alaska Entry Commission Limited Entry Permit for the Prince William Sound salmon seine fisheries of the same type obtained by Defendants from Plaintiffs, such transfer to occur as soon as reasonably possible, and the Defendants agree to provide Plaintiffs with an executed Commercial Fishing Entry Commission Intent to Transfer form and Request to Transfer form for the above-mentioned Limited Entry Permit within fifteen (15) days following Defendants' attorney being provided with such forms;

. . . .

(9) Upon completion of the terms of this agreement, including completion of the transfer of the said fisheries permit, the parties by their attorneys shall stipulate to a dismissal with prejudice of the above-entitled cause of action.

At the time of signing the settlement agreement the Browns did not own a permit, but believed their son would reconvey the permit to them.

As required by the settlement agreement, the Bakers' attorney provided the Browns' attorney with the necessary forms to begin the process of transferring a limited entry permit. The forms were forwarded to Malcolm Brown, who signed the Notice of Intent to Transfer. However, Malcolm Brown later decided not to transfer the permit and by June 15, 1980, the Browns knew their son would not convey the permit to them or the Bakers.

The Bakers sent a vessel they owned from Washington to Alaska, hoping to have the Browns' permit available for the 1980 fishing season. When it arrived they learned that the Browns would be unable to deliver the permit.

On November 7, 1980, the Bakers filed an amended complaint based upon breach of the settlement agreement, the June 6, 1977 promissory note and mortgage, and the alleged oral agreement of June 1978. The Browns answered and asserted affirmative defenses. They argued that the liabilities under the pre-settlement cause of action were resolved by the 1978 reconveyance of the STARBURST. Secondly, they asserted that the claim of breach of the settlement agreement was not maintainable because the Browns' performance was contingent upon the unsatisfied condition precedent, the acquisition by the Browns of a limited entry permit. Lastly, they argued that the security interest in the permit in the original promissory note, which was the basis for the initial suit and thus the motivating factor behind the settlement agreement, was unenforceable pursuant to statute, therefore, no damages could arise by failure to transfer the permit.

On January 19, 1981, the Bakers moved for summary judgment based upon the settlement agreement. The Browns opposed the motion and moved for summary judgment against the Bakers, requesting the court to dismiss the Bakers' complaint and order the Bakers to account for and turn over the profit realized by them upon resale of the STARBURST.

On April 12, the court granted the Bakers' motion for summary judgment and denied the Browns' motion. The court ordered trial to be conducted on the issue of damages only; however, no findings of fact and conclusions of law were issued at that time. The Browns applied for and received a stay of trial pending review by the supreme court. The supreme court denied the petition. On January 5, 1982, the Browns submitted a motion requesting findings of fact and conclusions of law. In response to the motion, on March 4, 1982, the court adopted those findings and conclusions submitted by the Bakers.

On March 17, the Browns were denied their request for leave to file a second amended answer and motion for order prohibiting plaintiffs from introducing evi-

dence as to lost profits. The court responded to the motion for leave to file a second amended answer stating:

> I might seem a little arbitrary here as I go through these. That motion is denied on its merits, not because of timeliness.

A jury trial on the amount of damages commenced on March 17, 1982. The jury awarded the Bakers $150,000. The permit was valued at $127,000, and $23,000 represented the loss of net income for 1980. The Browns submitted a motion for remittitur or new trial on March 25, 1982, which was denied on April 8, 1982. Notice of appeal was timely filed on May 10, 1982.

### II. *The 1980 Agreement and Summary Judgment*

Summary judgment was granted based upon the 1980 settlement agreement to return a permit to the Bakers. In reviewing that decision, we first address the issue of the validity of the settlement agreement. We are in accord with the Browns' contention that the settlement agreement was invalid.

■ The settlement agreement is not an independent transaction. In 1977, a promissory note was prepared for the original sale and transfer of the STARBURST. The parties stipulated in the note that the Browns would return the permit in the event of default. This language gives the Bakers a right to retake the permit. However, the Bakers assert that all parties to the mortgage knew that the language in the note "would not create a right of repossession, encumbrance or interest in the permit." Rather, they allege, the language was a " 'covenant' or promise to return the permit."

According to the Uniform Commercial Code as codified in Alaska, a security interest is created if the transaction is intended to create a security interest. AS 45.09.-102(a)(1). "Security interest" is defined in AS 45.01.201(37) as "an interest in personal property or fixtures which secures payment or performance of an obligation...."

The Bakers' explanation is internally inconsistent and merely an attempt to innocu-ously rename the transaction. Despite their assertion, the intent and function of the language of the promissory note was to secure the return of the permit if the Browns defaulted on the mortgage payments. "When it is found that a security interest as defined in Section 1–201(37) was intended, this Article applies regardless of the form of the transaction *or the name by which the parties may have christened it.*" *Queen of the North, Inc. v. LeGrue,* 582 P.2d 144, 148 (Alaska 1978) (footnote omitted, emphasis added).

An encumbrance or reservation of a security interest in a limited entry fishing permit is illegal under AS 16.43.150(g). Except as otherwise provided by this statute, an entry permit may not be

> (1) pledged, mortgaged, leased, or encumbered in any way;
>
> (2) transferred with any retained right of repossession or foreclosure....

Thus, the "promise" to return the permit, incorporated into the 1977 promissory note, is a security interest and thus violates AS 16.43.150(g).

The next question is what effect, if any, should be given to the illegal agreement and how did the security agreement affect the alleged oral agreement of June 1978 and the settlement agreement of January 28, 1980, in which the Browns agreed to return the permit.

> The Restatement (Second) of Contracts § 320(1) (Tent. Draft No. 12, 1977) states the rule that a promise is unenforceable if legislation so provides, or if the interest in enforcement is clearly outweighed by the public policy against enforcement. Generally, one who has himself participated in an illegal act cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction.
>
> ....
>
> However, it is not the case that all unlawful agreements are *ipso facto* void. If the denial of relief is disproportionately inequitable the right to recover will not be denied. 14 Williston on Contracts

§ 1630A (3d ed. 1972). Factors a court should consider in performing this balancing include: the justified expectations of the parties; the forfeiture that would result from non-enforcement of the agreement; any special public interest in enforcement; the strength of the public policy that the agreement violates, as shown by legislation or court decision; the likelihood that refusal to enforce will further that policy; and the seriousness of the misconduct. Restatement (Second) of Contracts § 320(1) (Tent. Draft No. 12, 1977).

... [T]here is a strong presumption that agreements in violation of a statute will not be sanctioned by the courts. *Jackson Purchase, Etc. v. Local Union 816*, 646 F.2d 264, 267 (6th Cir.1981) (citations omitted).[1]

The Limited Entry Act was directed at regulating entry into the fisheries to promote conservation. AS 16.43.010(a). The legislature also sought to avoid subjecting fishermen to "economic coercion" as a result of holding a valuable license to participate in the fishery. *See* 1973 House Journal 504. Subsection (g) resulted from this aim; its effect is to allow fishermen to take advantage of the value of their permits if they no longer wish to participate in the fishery, but *to prevent the forced loss of livelihood that would result from court-ordered sales of permits.* Therefore, because the security agreement contravenes and defeats the purpose of the statute and because we see no special public interest in enforcing the illegal agreement, this portion of the original sales agreement is unenforceable. *See Belgelfer v. Najarian*, 381 Mass. 177, 409 N.E.2d 167, 175 (1980).

We also find that the alleged oral agreement of June, 1978 and the settlement agreement of January, 1980 are also invalid and unenforceable.

It is a well-settled doctrine that if an agreement grows immediately out of, or is connected with, an illegal or immoral act or agreement, a court cannot lend its aid to enforce it, though it is in fact a new agreement. Otherwise, it has been pointed out, an enforceable contract "could rise from the funeral pyre of one that was void."

Upon the question whether a particular contract sought to be enforced arises out of an illegal transaction, the court will not be restricted to a partial statement of the facts, but will consider all the circumstances connected with the transaction so as to ascertain its real nature. If the connection between an original illegal transaction and a new promise can be traced, if the latter is connected with and grows out of the former, no matter how many times and in how many different forms it may be renewed, it cannot form the basis of a recovery. Repeating a void promise cannot give it validity.

17 Am.Jur.2d Contracts § 218 (1964) (footnotes omitted). *See also Orange County, Etc. v. Irvine Co.*, 139 Cal.App.3d 195, 188 Cal.Rptr. 552 (Cal.App.1983); *Union Collection Co. v. Buckman*, 150 Cal. 159, 88 P. 708, 711 (1908); *Sweinhart v. Bamberger*, 166 Misc. 256, 2 N.Y.S.2d 130, 133 (Sup.Ct.1937); *Bayer v. Burke*, 338 N.W.2d 293 (S.D.1983); and *Beverage Co. v. Villa Marie Co.*, 69 S.D. 627, 13 N.W.2d 670, 671 (1944).

The nexus between the security clause and later agreements is too close to support independent rationales for the transactions and none have been proposed. From the record it is clear that the promissory note formed the incentive for the subsequent oral and written agreements.

Because the promissory note, the alleged oral agreement, and the settlement agreement are invalid and unenforceable, the Bakers' motion for summary judgment should have been denied. As such, there is also no longer a genuine issue of fact in regard to Bakers' cause of action which requested damages for loss of the permit and loss of income based upon the illegal transaction. Accordingly, the trial court is

1. Restatement (Second) of Contracts § 320(1) (Tent. Draft No. 12, 1977), referred to in *Jackson* *Purchase*, has been republished as Restatement (Second) of Contracts § 178 (1981).

hereby directed to set aside the jury verdict and judgment rendered in favor of the Bakers, and to enter judgment in favor of the Browns' motion for summary judgment dismissing the Bakers' complaint.

### III. *Surplus from Resale of the Vessel STARBURST*

When the Browns returned the STARBURST to the Bakers, $200,000 was owing on the promissory note. The Bakers then sold the STARBURST for $240,000. Claiming entitlement to this $40,000 surplus, the Browns sought summary judgment, arguing that the Uniform Commercial Code was applicable and that AS 45.09.503–05 supported their claim. The trial court denied this motion.

### A. *State law applies*

When the Browns said they could not make the payments, the Bakers voluntarily took the boat back. Was this a "repossession" within the terms of the Uniform Commercial Code, or a foreclosure action under the Ship Mortgage Act? The Browns argue that AS 45.09.104 [2] does not preclude the application of AS 45.09.503, AS 45.09.-504 and AS 45.09.505 in the instant case. They further contend that the Ship Mortgage Act is inapplicable here even though there was a $200,000 preferred mortgage agreement. We agree.

■ Generally, the U.C.C., as adopted in Alaska, applies to security interests in vessels (*see, e.g., Blumenstein v. Phillips Insurance Center, Inc.*, 490 P.2d 1213 (Alaska 1971)), unless the area has been preempted by federal law. The Ship Mortgage Act, 46 U.S.C. § 951, is such a preemptive statute. In *J. Ray McDermott Co., Inc. v. Vessel Morning Star*, 457 F.2d 815, 818 (5th Cir.1972), *cert. denied*, 409 U.S. 948, 93 S.Ct. 271, 34 L.Ed. 218 (1972), the court stated:

**2.** AS 45.09.104 reads in part:
  AS 45.09.101–45.09.507 does not apply (1) to a security interest subject to any statute of the United States such as the Ship Mortgage Act, 1920, to the extent that the statute governs the rights of parties to and third parties affected

The Ship Mortgage Act, when read together with the statutes delineating the judicial sale procedure in the federal courts forms a comprehensive procedure for the foreclosure of a preferred ship's mortgage, the sale of the vessel and any resulting deficiency adjudged against the debtor *in personam*.[3]

In *Reedsburg Bank v. Apollo*, 508 F.2d 995 (7th Cir.1975), the court also described the exclusive jurisdiction of the federal court in regard to the Ship Mortgage Act.

*Only the jurisdiction to foreclose the lien of the mortgage and to determine its priority in relation to that of other liens in a proceeding in rem is made exclusive by the Act.* (46 U.S.C. § 951). The Act confers federal jurisdiction over an action in personam in admiralty to obtain a deficiency judgment against the mortgagor (46 U.S.C. § 954(a); see also Supplemental Rules for Fed.R.Civ.P. for Certain Admiralty and Maritime Claims, Rule C(1)(b), but leaves the state court with concurrent jurisdiction over such an action. Cf. *Madruga v. Superior Court*, supra, 346 U.S. [556] at 560–561, 74 S.Ct. 298 [300–301, 98 L.Ed. 290]. There is no suggestion anywhere in the Act that issues other than those necessarily arising in the foreclosure action and issues concerning the enforceability of other maritime liens are within the exclusive jurisdiction of the federal court or must be adjudicated in the foreclosure action.

*Id.* at 999 (emphasis added; footnote omitted).

■ In the instant case, upon default there was *no foreclosure action* and therefore the Ship Mortgage Act is inapplicable. The Bakers have not directed the court to any other federal statute that would preclude the application of AS 45.09.503–.505 and we are unaware of any. Thus we conclude the state law is applicable here.

by transactions in particular types of property; ...

**3.** Sale of personalty is governed generally by 28 U.S.C. §§ 2001, 2004. Suits *in personam* in admiralty on default for a deficiency are governed by 46 U.S.C. § 954.

## B. *Application of state law*

The Browns argue that according to AS 45.09.503 the Bakers repossessed the collateral (the boat) and that following repossession the Bakers had either the option (1) to resell the collateral which would entitle the Browns to any surplus (AS 45.09.504); or (2) to retain the collateral in satisfaction of the entire debt (AS 45.09.505). The Browns argue that the Bakers are precluded now from arguing that they took the boat back in satisfaction of the debt under AS 45.09.505 because the Bakers never gave written notice of that intent as required by the statute. The Browns assert that because the Bakers sold the boat, they are entitled to the surplus under AS 45.09.504.

The Bakers argue that there was never a repossession or foreclosure of the marine mortgage and thus AS 45.09.101 *et seq.* is inapplicable.

Under AS 45.09.503, the secured party may take possession of collateral upon default without judicial process. That statute states in part:

Unless otherwise agreed, a secured party has on default the right to take possession of the collateral. In taking possession, a secured party may proceed without judicial process....

No judicial process was used in this case. In *Minnesota State Bank of St. Paul v. Batcher,* 263 Minn. 71, 116 N.W.2d 77, 81 (1962), and *Greer v. Zurich Insurance Company,* 441 S.W.2d 15, 27 (Mo.1969), "repossession" is defined (by reference to Webster's Dictionary) as "the act of resuming the possession of property when the purchaser fails to keep up payments on it." Here, the Bakers did resume possession of the property when the Browns could not make payments.

Once repossession has occurred, the creditor has two possible remedies: AS 45.09.504 and AS 45.09.505. AS 45.09.504 reads in pertinent part:

(a) A secured party after default may sell, lease, or otherwise dispose of any or all of the collateral in its then condition or following a commercially reasonable preparation or processing. Any sale of goods is subject to AS 45.02.101–45.02.725. The proceeds of disposition shall be applied in the order following to

(1) the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorney fees and legal expenses incurred by the secured party;

(2) the satisfaction of indebtedness secured by the security interest under which the disposition is made;

. . . .

(b) If the security interest secures an indebtedness, the secured party *must account to the debtor for a surplus, and, unless otherwise agreed, the debtor is liable for a deficiency.* But if the underlying transaction was a sale of accounts, contract rights, or chattel paper, the debtor is entitled to a surplus or is liable for a deficiency only if the security agreement so provides.

(c) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts.... Unless collateral is perishable or threatens to decline speedily in value ... reasonable notification of the time and place of a public sale or reasonable notification of the time after which a private sale or other intended disposition is to be made shall be sent by the secured party to the debtor....

It is clear that under AS 45.09.504 the creditor retains the right to a deficiency unless otherwise agreed. Thus, the right to a deficiency may be waived. However, the debtor *may not waive his right to a surplus* if the creditor proceeds under AS 45.09.504. *See* AS 45.09.501(c)(1); 4 R. Anderson, Uniform Commercial Code § 9–501:10, at 584 (1971); 69 Am.Jur.2d Secured Transactions § 582, at 472 (1973); 79

C.J.S. Supp., *Secured Transactions* § 100, at 116 (1974).[4]

AS 45.09.505 provides in pertinent part: AS 45.09.505. Compulsory disposition of collateral; acceptance of the collateral as discharge of obligation. . . .

(b) In any other case involving consumer goods or any other collateral, a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. *Written notice of the proposal shall be sent to the debtor*. . . . If the debtor ... objects in writing within 30 days from the receipt of the notification ... the secured party must dispose of the collateral under AS 45.09.504. In the absence of this written objection, the secured party may retain the collateral in satisfaction of the debtor's obligation.

(Emphasis added).

Under AS 45.09.505 the creditor retains the collateral in satisfaction of the debt; however, the creditor must give written notice to the debtor that he intends to retain the collateral in lieu of resale in satisfaction of the debt.

In the instant case, the Bakers did not give written notice of any intent to retain the collateral in satisfaction of the debt. Thus they are precluded from asserting that AS 45.09.505 is applicable here.[5]

However, AS 45.09.504 as a matter of law applies to the facts of the instant case because after repossession the Bakers did sell the collateral. Therefore, the Browns are entitled to the surplus, if any, after deductions for the Bakers' set-off claims for vessel damages, repairs, or other necessary and related expenses incurred in the repossession and sale of the vessel.[6]

REVERSED and REMANDED for further proceedings in accordance with this opinion.

---

4. We note that some jurisdictions permit post default waiver by debtor of his right to notice of the sale. Because this is not at issue at this time, we need not discuss it.

5. We note that we have relaxed the written notice requirement of AS 45.09.505 in a situation where the creditor seeks a deficiency under AS 45.09.504 and where the debtor defends by asserting that the creditor by his actions manifested an intent to return the collateral in satisfaction of the debt. *Moran v. Holman,* 514 P.2d 817 (Alaska 1973). We further recognize that other jurisdictions have similarly relaxed this rule in this situation. *Nelson v. Armstrong,* 99 Idaho 422, 582 P.2d 1100, 1109 (1978) and *Tanenbaum v. Economics Laboratory, Inc.,* 628 S.W.2d 769 (Texas 1982), Annot., 55 A.L.R.3d

651, 654 (1974). However, we find no reason to relax the written notice requirement of AS 45.-09.505 where it is the creditor and not the debtor who argues that he opted to retain the collateral in satisfaction of the debt. The onus is on the creditor to give notice of his election to sell or to retain the collateral. By requiring the creditor to give written notice, the debtor clearly is aware of his position and can decide whether or not to request a sale of the collateral.

6. We need not decide whether an explicit agreement discharging the debt at the time collateral is returned makes AS 45.09.504 and AS 45.09.-505 inapplicable. The Bakers have not raised such an agreement as a defense against Browns' claim.