82 N.Y.2d 375 (1993)
624 N.E.2d 995
604 N.Y.S.2d 900
Howard S. Denburg, Respondent,
v.
Parker Chapin Flattau & Klimpl, Appellant.
Court of Appeals of the State of New York.
Argued October 5, 1993.
Decided November 18, 1993.
Parker Chapin Flattau & Klimpl, New York City (Alvin M. Stein, Mark Abramowitz and Amos Alter of counsel), appellant pro se.
Fried, Frank, Harris, Shriver & Jacobson, New York City (Sheldon Raab, Honey L. Kober and Dino Fusco of counsel), for respondent.
Judges SIMONS, TITONE, HANCOCK, JR., SMITH and LEVINE concur with Chief Judge KAYE; Judge BELLACOSA dissents in a separate opinion.
*377 Chief Judge KAYE.
In this dispute between a law firm and a former partner, we agree with the Appellate Division that a provision in the partnership agreement requiring certain payments upon a *378 partner's withdrawal is unenforceable under Cohen v Lord, Day & Lord (75 N.Y.2d 95). Nevertheless, we conclude that the Appellate Division erred in granting the former partner's summary judgment motion because there are disputed factual issues surrounding a purported settlement agreement. Accordingly, we modify and remit to the trial court for further proceedings.

I.
In 1983, the partners in the Manhattan law firm Parker Chapin Flattau & Klimpl  including plaintiff  executed an amended partnership agreement requiring withdrawing partners to pay certain specified sums to the partnership upon demand. In substance, subparagraph 18 (a) of the agreement provided that if a withdrawing partner practiced law in the private sector prior to July 1988, the former partner had to pay the firm greater of (i) 12.5% of the firm's profits allocated to the partner over the two previous years or (ii) 12.5% of billings to former Parker Chapin clients made by the partner's new firm over the ensuing two years. The agreement provided an exception to this requirement, however, for departing partners whose previous year's profit allocation was less than $85,000  but only if the partner's new firm did no work for Parker Chapin clients over the next two years. The agreement also provided that the firm could apply the partner's capital account  which would otherwise have been disbursed at the end of the fifth fiscal year after withdrawal  to satisfy the partner's obligation.[*]
In early 1984 plaintiff left Parker Chapin to join a New Jersey law firm, and allegedly continued serving some of the same clients. In August 1986 Irving Rosenzweig, a member of the Parker Chapin's executive committee, wrote to plaintiff requesting information about his new firm's billings to Parker Chapin clients from March 9, 1984 through March 9, 1986 so that plaintiff's liability under the agreement could be computed. According to Rosenzweig, he spoke to plaintiff shortly afterwards, and plaintiff suggested that Parker Chapin simply keep the balance of his capital account in satisfaction of the obligation, whereupon Rosenzweig agreed on behalf of the firm and the account was "written off." Plaintiff disputes these allegations.
*379 The matter was dormant until February 1990  two months after our decision in Cohen v Lord, Day & Lord (75 N.Y.2d 95, supra)  when plaintiff commenced an action against Parker Chapin asserting four causes of action. The first sought a declaration that subparagraph 18 (a) was void as against public policy and directing defendant to repay sums illegally withheld, alleged to be at least $24,800; the second was for breach of the contract provision that would ordinarily require the capital account to be disbursed at the end of the fifth fiscal year following withdrawal; the third sought an accounting; and the fourth was for an "account stated."
Defendant answered, raising affirmative defenses and counterclaims, and plaintiff moved for summary judgment and dismissal of the counterclaims. Parker Chapin defended the disputed clause on the ground that it was not a void forfeiture-for-competition provision in the Cohen mold, but was designed instead to assure that partners who left the firm equitably shared in the burden of extraordinary obligations it would be assuming in connection with a move to new quarters. Specifically, Parker Chapin submitted evidence that the firm entered into a new lease commencing December 1, 1983 at a six-fold rent increase and borrowed $4.5 million in June 1984, allegedly to finance the move and refurbish the space. According to the firm, moreover, it predicted that it would take at least five years to recover from the impact of these increased expenses and accordingly restricted subparagraph 18 (a) to that duration. Parker Chapin additionally contended that any issues relating to plaintiff's obligations under subparagraph 18 (a) were finally settled in 1986, when plaintiff agreed that the balance in the capital account should simply be taken to resolve the matter.
Distinguishing Cohen, Supreme Court declined to declare subparagraph 18 (a) invalid because it might be shown to be a "reasonably limited arrangement for recoupment of partnership liabilities." It also denied summary judgment on the breach of contract claim because of the factual dispute surrounding plaintiff's purported settlement agreement. The court similarly denied plaintiff's request for an accounting, and denied summary judgment on the "account stated" cause of action. The court did, however, grant plaintiff's motion for dismissal of the counterclaims.
On plaintiff's appeal, the Appellate Division modified by granting him summary judgment on the first three causes of *380 action and remitting for an accounting. It held that while paragraph 18 might have had as an incidental objective the recoupment of partnership liabilities in connection with the firm's relocation, its principal function was to prevent withdrawing partners from competing with the firm, and was thus as much an improper forfeiture-for-competition provision as the one in Cohen.
In response to defendant's settlement argument, the court observed that even if plaintiff did agree to set off his capital account as alleged, it was "merely repetitive of, and no more enforceable than" the provision in subparagraph 18 (a) permitting the firm to apply the capital account in satisfaction of the obligations arising under the paragraph (184 AD2d, at 345). Accordingly, the court remitted for an accounting (third cause of action). Finally, the parties have consented to dismissal of the account stated claim.
On remittal, the accounting revealed a capital account balance of $24,933.62. Final judgment was entered in that amount, and this Court granted defendant leave to appeal. We now modify by affirming to the extent subparagraph 18 (a) was declared unenforceable and remit for further proceedings.

II.
Analysis begins with Cohen v Lord, Day & Lord. There, we held that DR 2-108 (A) of the Code of Professional Responsibility  which states that a lawyer may not "participate in a partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement"  reflects public policy, rendering certain anticompetition clauses void and unenforceable.
As we made clear, restrictions on the practice of law, which include "financial disincentives" against competition as well as outright prohibitions, are objectionable primarily because they interfere with the client's choice of counsel: a clause that penalizes a competing attorney by requiring forfeiture of income could "functionally and realistically discourage" a withdrawing partner from serving clients who might wish to be represented by that lawyer (75 NY2d, at 98).
In Cohen, we voided a provision that required withdrawing partners to relinquish their share of revenues earned but uncollected by the firm if they worked in private practice or as in-house counsel in any State where the firm had an office, *381 or in neighboring States. We concluded that the "significant monetary penalty it exacts, if the withdrawing partner practices competitively with the former firm, constitutes an impermissible restriction on the practice of law." (75 NY2d, at 98.)
We acknowledged, however, a law firm's legitimate interest in its own survival and economic well-being and cautioned against a "categorical interpretation or application" of the decision (75 NY2d, at 101-102). Parker Chapin thus argues that subparagraph 18 (a) had the legitimate purpose of assuring some restitution to the firm by partners who abandoned the enterprise just as the firm undertook extraordinary relocation expenses. Defendant emphasizes the limited duration of the clause, and argues that no anticompetitive effect was intended or realized because of the modest sums involved and the fact that plaintiff, as well as other partners, did leave the firm notwithstanding the clause.
While defendant criticizes the Appellate Division's finding (184 AD2d, at 345) that the "principal function" of the clause was to discourage competition  it argues that the intended function is a fact issue  we note that in the present context focus should essentially be not on the intent of the clause but on its effect.
Even crediting Parker Chapin's assertions as to the purpose of subparagraph 18 (a), we conclude that its effect is to improperly deter competition and thus impinge upon clients' choice of counsel. First, it applies only to lawyers continuing in private practice  and thus potentially in competition with the firm  but not other practitioners (for example, government lawyers) who do not threaten the firm's client base. Ability to pay cannot explain this discrimination because a departing partner becoming a high-paid corporate officer or embarking on a lucrative business venture is exempt from the required payment but an attorney starting a sole practice is not.
The provision, moreover, requires a departing partner to pay the greater of two amounts, one computed on the basis of billings to former clients of the firm. This bears little relation to the purported compensatory purpose of the clause and instead exacts an amount directly proportional to the success of a departing partner's competitive efforts. Finally, the clause exempts partners who received relatively lower earnings  but only if no Parker Chapin clients are served. A junior partner changing firms might well insist that a Parker Chapin client not come along.
*382 Defendant's argument that the amount at issue is insubstantial, and indeed would not (and did not) discourage partners from leaving the firm or serving former clients, is similarly unpersuasive. A clause that is facially invalid cannot be saved merely because some partners chose to absorb the penalty imposed. Indeed, the partner in Cohen also left his firm, and we voided the clause. Nor is the sum involved here  about $25,000  insubstantial. Finally, while the limited duration may be evidence of the firm's intent, the effect of the clause nevertheless impacts substantially during the five years it operates (compare, Jacob v Norris, McLaughlin & Marcus, 128 NJ 10, 607 A2d 142 [voiding financial disincentive that operates for one year after departure]). Moreover, if a short duration were dispositive a firm could evade the law by periodically reexecuting partnership agreements containing short-term forfeiture-for-competition clauses.
Conspicuously absent from the dissent is any discussion of the terms of the disputed clause. Apparently, so long as the law firm can articulate an economic justification for a forfeiture (see, dissenting opn, at 386 [quoting from the Rosenzweig affidavit]), the dissent would hold that Cohen is inapplicable  even if competitors are the only ones affected. Neither defendant nor the dissent has adequately explained how the present clause is tailored to the concerns that purportedly inspired it.
In sum, we agree with the Appellate Division that subparagraph 18 (a) is unenforceable as against public policy.

III.
That does not end the matter, for we must also consider the effect of the purported 1986 settlement agreement.
Initially, we note the Appellate Division erred in its suggestion that plaintiff's alleged agreement to forgo his capital account balance in satisfaction of his paragraph 18 obligation was "merely repetitive of," and thus "no more enforceable than," the clause's set-off provision. Plaintiff's obligation under paragraph 18 was not measured by the balance in the capital account, but by a computation based on previous profit allocations or future billings to ex-Parker Chapin clients. Although the firm had a "lien" on the account to discharge plaintiff's obligation, the firm could insist upon additional payment if the balance were insufficient. It was in this context that, when asked to provide a list of billings to former Parker *383 Chapin clients, plaintiff allegedly agreed to relinquish his account to settle the matter. Manifestly, that alleged agreement was not merely duplicative of the set-off provision.
Strong policy considerations favor the enforcement of settlement agreements (see, Hallock v State of New York, 64 N.Y.2d 224, 230). A negotiated compromise of a dispute avoids potentially costly, time-consuming litigation and preserves scarce judicial resources; courts could not function if every dispute devolved into a lawsuit. Moreover, there is a societal benefit in recognizing the autonomy of parties to shape their own solution to a controversy rather than having one judicially imposed. Additionally, a settlement produces finality and repose upon which people can order their affairs.
These interests are advanced only if settlements are routinely enforced rather than becoming gateways to litigation (see, e.g., Matter of Olympic Tower Assocs. v City of New York, 81 N.Y.2d 961, 963). Consequently, the law does not erect insuperable barriers to the creation of binding agreements. To constitute sufficient consideration, for example, a party need only have a good-faith belief in the merit of its position (see, Schuttinger v Woodruff, 259 N.Y. 212, 216-217). That the party's view of the law might ultimately prove meritless does not undermine the validity of the agreement (Restatement [Second] of Contracts § 74, comment b). Indeed, if the rule were otherwise, there would be little incentive to enter into a compromise.
As developed at common law, there was a distinction between the settlement devices of "accord and satisfaction" and "substituted agreement." An accord and satisfaction, as its name implies, has two components. An accord is an agreement that a stipulated performance will be accepted, in the future, in lieu of an existing claim (Werking v Amity Estates, 2 N.Y.2d 43, 51, appeal dismissed and cert denied 353 US 933; Reilly v Barrett, 220 N.Y. 170, 172-173; General Obligations Law § 15-501 [1]). Execution of the agreement is a satisfaction (Reilly v Barrett, 220 NY, at 173). The distinctive feature of an accord and satisfaction is that the obligee does not intend to discharge the existing claim merely upon the making of the accord; what is bargained for is the performance, or satisfaction. If the satisfaction is not tendered, the obligee may sue under the original claim or for breach of the accord (Plant City Steel Corp. v National Mach. Exch., 23 N.Y.2d 472, 478; General Obligations Law § 15-501 [3]).
*384 By contrast, the parties may intend that a new agreement, though executory, will immediately discharge the existing obligation (see, e.g., Morehouse v Second Natl. Bank, 98 N.Y. 503, 509). That is a substituted agreement (Calamari and Perillo, Contracts § 21-4, at 869 [3d ed]). Whether a particular arrangement is an accord or a substituted agreement hinges on the parties' intent, determination of which may be aided by certain presumptions (Goldbard v Empire State Mut. Life Ins. Co., 5 AD2d 230, 234 [Breitel, J.]). In the present case, the litigants' analyses center on the doctrine of accord and satisfaction, indicating no dispute about the parties' intent in that regard.
Historically, executory accords were not enforceable; although the underlying obligation remained in effect, an accord without satisfaction was not binding (see, Larscy v Hogan & Sons, 239 N.Y. 298, 301-302; Reilly v Barrett, 220 NY, at 173). Upon recommendation of the Law Revision Commission, however, the Legislature in 1937 discarded the common-law rule, and now an executory accord is enforceable so long as "the promise of the party against whom it is sought to enforce the accord is in writing and signed by such party" (General Obligations Law § 15-501 [2]). By implication, the common-law rule survives to the extent an executory accord is not reduced to writing.
The purported settlement agreement in the present case was oral and thus unenforceable unless executed. The parties agree that the accord would be satisfied when the capital account was "written off." Because there is a factual dispute regarding when, if ever, the account was actually adjusted on defendant's books, the case must be remitted to Supreme Court to resolve this issue.
Similarly, other factual issues must be resolved before the alleged settlement agreement may be given effect. Plaintiff contends, for example, that the purpose of his discussion with Rosenzweig was to quantify the amount owed, and that he never intended to surrender the right to challenge the validity of the paragraph 18. Plaintiff is correct that the parties' intent governs the scope of an accord (see, Werking v Amity Estates, 2 NY2d, at 52). To effectuate the settlement agreement, however, the trial court would not have to find that plaintiff had a specific intent to relinquish a potential challenge to the clause's validity; indeed, inasmuch as Cohen was not decided until well after the parties' discussion, it is unlikely they had *385 any intent with regard to that issue. Rather, it would be sufficient to find that plaintiff intended to conclude the matter and that he did not specifically reserve a challenge to the clause's validity (see, Matter of Olympic Tower Assocs. v City of New York, 81 NY2d, at 963).
Finally, plaintiff argues that the unenforceability of paragraph 18 on public policy grounds renders any settlement of a claim arising under that paragraph likewise unenforceable, noting that were the rule otherwise, "the parties could by their private agreement waive the illegality and evade the prohibition against the original contract." (Sweinhart v Bamberger, 166 Misc 256, 259; see, Restatement of Contracts § 590; 14 Williston, Contracts § 1629, at 9-10 [3d ed 1972].) While some bargains are so offensive to society that courts will not entertain the action  essentially leaving the parties where they are (see, e.g., McConnell v Commonwealth Pictures Corp., 7 N.Y.2d 465, 467; Flegenheimer v Brogan, 284 N.Y. 268, 272-273)  in other cases an illegal agreement is not so repugnant and may be enforced (see, Lloyd Capital Corp. v Pat Henchar, Inc., 80 N.Y.2d 124, 127-128). It is all a matter of degree.
Given the strong policies in favor of voluntary settlements of disputes, we conclude that an agreement to settle a dispute involving a forfeiture-for-competition provision may be enforced even though the clause itself is unenforceable (compare, Restatement [Second] of Contracts § 78). Financial disincentives to withdrawal from a law partnership are certainly not as offensive as commercial bribery (McConnell v Commonwealth Pictures Corp., 7 N.Y.2d 465, supra) or fraud (Flegenheimer v Brogan, 284 N.Y. 268, supra). Moreover, unlike outright prohibitions on the practice of law, agreements involving financial disincentives are not per se illegal but depend on the particular terms and circumstances. Accordingly, public policy is best served by permitting parties to amicably resolve disputes arising under such provisions rather than forcing each such controversy to be decided by the judiciary.
Appellant's remaining contention is without merit.
Accordingly, the judgment of Supreme Court appealed from and the order of the Appellate Division brought up for review should be modified, without costs, and the case remitted to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed.
BELLACOSA, J. (dissenting).
I respectfully dissent, concluding that the withdrawn partner's case is meritless. The law firm *386 partnership provision at issue should not be declared void as against public policy for it is not within the intendment or language of Cohen v Lord, Day & Lord (75 N.Y.2d 95). The Court there expressly warned against "categorical interpretation or application" of such provisions, envisioned a flexible, practical analysis, and pinpointed the narrow effect of the adjudicated principle to the "contested clause" in the "context" of that "litigation" and "professional relationship" (id., at 102).
In this case, the Court turns away from those crucial qualifications and that admonition. The consequence of squeezing this capital account partnership provision  insofar as it affects partners who defect from the partnership and its capital obligations  into the narrow Cohen prohibition inevitably creates the eschewed absolutist universe. Ignored or bypassed are the individualized economic and professional factors, seasoned with the hoped-for but unrealized realism and practicality, that are the hallmarks of this provision, contrasted to that in Cohen. The fact that the provision here, understood and explained through appropriate extrinsic evidence, is keyed to a special, temporally limited proportionate capital leasehold risk affecting all then-liable partners, is ignored and given no weight or consideration. Those are the kind of features that the Court was concerned about when it asserted a flexible formula in Cohen to govern and guide future disputes relating to the wide variety of these extant and still adjusting and evolving provisions.
The partners here were bound by a fiduciary, contractual, long-term fiscal and professional relationship inter sese, as law partners. However, the provision that bound them together and defined the consequences when any one of them should leave the firm is sufficiently different in degree, in kind, and in litigation context and professional relationship to distinguish it from the one in Cohen v Lord, Day & Lord (75 N.Y.2d 95, 102, supra). Here, it was formulated in 1983 to deal with a specific capital risk undertaken by all partners together and was designed to "insure that either the partners stayed together for five years to share the burden of these increased costs and expenses, or that those who chose not to do so would compensate the Firm appropriately" (affidavit of Rosenzweig; compare, Gillers, A Rule Without A Reason: [Let the market, not the bar, regulate settlements that restrict practice], 79 ABA J 118 [Oct. 1993]). Therefore, the provision at issue here *387 should not be viewed in a vacuum, and the extrinsic evidence that legitimately explains its functional purpose cogently serves to take this provision out of the narrow, prohibited Cohen public policy blunderbuss. This one is not directed essentially at the concerns exalted in the Code of Professional Responsibility and only incidentally affects the lawyers' relationships to clients.
Moreover, to allow lawyers, like plaintiff, to use the ennobling professional objectives that underlie Cohen v Lord, Day & Lord (75 N.Y.2d 95, supra) to unearth settled matters, and to leverage dollar differences in this fashion, is an expressly contraindicated, puristic application of the Cohen rationale and objective, that gives plaintiff an unmerited, delayed-action windfall. Here, plaintiff entered the partnership agreement in 1983, negotiated with his firm, defendant Parker Chapin, about settling the capital account in 1986, and conspicuously abandoned this apparently amicably resolved dollar battle. Then, two months after this Court's sharply divided decision in Cohen in 1990, the long gone partner resuscitated the dead-to-dormant dispute. These machinations do not foster the professionalism and the goals of the Code of Professional Responsibility that are the sole root of this Court's narrowly fashioned remedy in Cohen. Rather, they further undermine those high concerns by emphasizing and rewarding dollars over service under the aegis of public policy that is broadly superimposed over contractual arrangements between reasonable lawyers, who are part of a public profession and are or were part also of a joint economic enterprise.
I could join in the Court's remittal were I not convinced that the right result is to go the whole distance and reject plaintiff's theory outright on the ground that the contested provision of this partnership agreement is not void as violative of the kind of professionalism that the Court had in mind when it declared its public policy view in such cautious fashion in Cohen (compare, Hackett v Milbank, Tweed, Hadley & McCloy, 181 AD2d 519, revd on other grounds 80 N.Y.2d 870).
Judgment of Supreme Court appealed from and order of the Appellate Division brought up for review modified, etc.
NOTES
[*] Subparagraph 18 (a) is quoted at 184 AD2d 343, 343-344.