■ In the Matter of NEW YORK CITY ASBESTOS LITIGATION. ANNE M. SOUTH, Respondent, v CHEVRON CORPORATION, Appellant, et al., Defendant. [62 NYS3d 309]—

Order, Supreme Court, New York County (Peter H. Moulton, J.), entered on or about January 5, 2016, which, to the extent appealed from, denied defendant Chevron Corporation's alleged predecessor in interest's (Texaco) motion for summary judgment dismissing the complaint as against it, affirmed.

Plaintiff's decedent, Mason South, and plaintiff, South's wife, commenced this action alleging that South's mesothelioma resulted from his exposure to asbestos during his 37-year career in the Merchant Marine. They claimed that defendant Texaco manufactured, produced, sold, supplied, merchandised and/or distributed asbestos-containing products that were located on the ships South worked on. The claims were brought under the Jones Act (46 USC § 30104 *et seq.*). South's wife asserted derivative claims and was substituted as plaintiff after South died of mesothelioma.

Texaco moved for summary judgment dismissing the complaint as against it. The basis for the motion was a release that South had given to it in connection with an earlier lawsuit, also in connection with his exposure to asbestos on merchant ships. In that Jones Act action, filed in 1997 in the United States District Court for the Northern District of Ohio, South alleged that "[a]s a direct and proximate result of said exposure to asbestos aboard the said vessels as well as secondary or passive smoke that hung still in the atmosphere free from dissipation for lack of adequate ventilation, Plaintiff suffers cancerphobia, traumatic stressful fear of affliction and worsening of pneumoconiosis as well as exacerbation of existing diseases; and suffers anatomical disorder, structural changes, pulmonary diseases inclusive of asbestosis/mesothelioma/lung cancer/ pneumoconiosis/chronic obstructive pulmonary disease/colon cancer/stomach cancer/rectal cancer/kidney cancer/pancreas cancer/pharynx cancer/brain cancer/other anatomical cancer, et cetera, either singularly or in combination thereof; and, moreover, Plaintiff suffers harm in the form of necessity to be monitored for other asbestotic diseases including lung cancer." The release that South executed in connection with the settlement of the 1997 action stated that South, "for himself, his heirs, administrators, beneficiaries, executors and assigns," released Texaco "forever" from any and all "actions, suits, [and] claims" which he "has now, has ever had, or which may accrue in the future." The release included any "bodily and/or personal injuries, sickness or death" which allegedly occurred as a result of South's asbestos exposure. The release acknowledged that the "long term effects of exposure" to asbestos might result in "obtaining a new and different diagnosis from the diagnosis as

of the date of this Release." South stated in the release that despite this, he knew that he would be giving up the right to bring an action in the future for "any new or different diagnosis that may be made" as a result of his exposure to any asbestos or other product. This provision also pertained to South's executors, administrators, and heirs. South acknowledged that he had read the full release, discussed it with his attorney, and was signing it with full knowledge of its contents, and that he would be legally bound by it. In return for furnishing the release, South was paid $1,750.

In opposition to the motion, plaintiffs argued that the release did not preclude the claim for mesothelioma, based on section 5 of the Federal Employers' Liability Act (FELA) (45 USC § 55), which requires strict scrutiny of releases and prohibits agreements that exempt common carriers from liability. Under that standard, plaintiffs asserted that at the time South signed the release, he did not have mesothelioma and was not aware of the risk of mesothelioma as a potential injury from his asbestos exposure.

The court denied Texaco's motion. It focused its analysis on two federal cases, one from the Sixth Circuit adopting a bright-line test voiding releases that attempt to bar claims for injuries that have not been explicitly forsaken, and one from the Third Circuit enforcing such releases, provided that the plaintiff understood the actual specific risks being released. The motion court held that, under either circuit's standard, Texaco failed to establish that South understood he was releasing a future claim for mesothelioma. Under the more lenient Third Circuit test, the 1997 release was inadequate because although it referred to future claims arising out of asbestos exposure and contemplated a second injury, it did not mention cancer or mesothelioma explicitly. Moreover, the court characterized the settlement payment South received as consideration for the 1997 release as, "[b]ased on this court's experience . . . extremely low, given . . . South's alleged extensive asbestos exposure." The court alternatively described the amount as "meager."

Texaco argues on appeal that the release should be enforced because it represents a compromise of a known claim, not an exemption from liability for a future unknown claim. It contends that because the release resolved an action arising out of South's exposure to asbestos, it applies to additional injuries that might later manifest themselves as a result of the same exposure. Texaco notes that the 1997 complaint asserted a claim for possible diseases stemming from his exposure, and

mentioned mesothelioma as one of those diseases. Thus, Texaco reasons, the release necessarily embraced mesothelioma as a condition South was aware of as a risk of asbestos exposure but was willing to compromise as a claim in exchange for monetary consideration. Texaco stresses the language in the release by which South acknowledged that his exposure to asbestos could cause new diseases that were not yet apparent on the date he executed the release, and his statement in the release that he had read it carefully and had had the assistance of counsel.

The Jones Act provides merchant mariners, such as South, with a right of action for injuries and death arising out of the performance of their duties. The statute incorporates FELA by reference (*American Dredging Co. v Miller*, 510 US 443, 456 [1994] ["the Jones Act adopts the entire judicially developed doctrine of liability under the Federal Employers' Liability Act" (internal quotation marks omitted)]). While section 5 of FELA voids any contract, such as a release, "the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter" (45 USC § 55), the United States Supreme Court has differentiated between an agreement conferring a broad immunity from liability and one, such as a release, that compromises an actual claimed liability (*see Callen v Pennsylvania R. Co.*, 332 US 625, 631 [1948]).

Nevertheless, not all releases can pass muster under section 5. As noted by the motion court, there is a split in the federal circuits as to the standard under which a release should be analyzed for FELA purposes, although both cases discussed by the court resulted in the release at issue being declared unenforceable. In *Babbitt v Norfolk & W. Ry. Co.* (104 F3d 89, 93 [6th Cir 1997]), the Sixth Circuit concluded that for a FELA release to be valid, it "must reflect a bargained-for settlement of a known claim for a specific injury, as contrasted with an attempt to extinguish potential future claims the employee might have arising from injuries known or unknown by him." The Third Circuit, in contrast, focused, in *Wicker v Consolidated Rail Corp.* (142 F3d 690, 701 [3d Cir 1998], *cert denied* 525 US 1012 [1998]), on the broader question of whether, as opposed to an actual injury, the plaintiff who signed the release was aware of "known risks even if there is no present manifestation of injury." The *Wicker* court cautioned, however, that a release should be carefully construed to ensure that the plaintiff was specifically aware of the known risks, and that the inclusion of boilerplate in the release would militate against such a conclusion. Thus, the Third Circuit declined to dismiss the complaint

in *Wicker*, finding that the five releases at issue there either were pro forma and did not reflect any actual negotiation of the claims being waived or were blunderbuss efforts to preclude any and all possible claims. Texaco contends that neither case applies here. It points out that *Babbitt* did not deal with a release in connection with the settlement of a lawsuit, but rather in the context of the plaintiff's separation from the defendant as part of an early retirement program. With respect to *Wicker*, Texaco contrasts the releases in those cases, which it characterizes as going "well beyond the specific controversies that had been settled," with the release here.

We start with the observation that, since this is an admiralty case, Texaco bears the burden of establishing that the release is enforceable (*see Garrett v Moore-McCormack Co.*, 317 US 239, 248 [1942]). That burden includes demonstrating that South fully understood his rights and received adequate consideration (*id.*). Turning to the two federal cases discussed by the parties, there is no question that *Babbitt*, assuming it applied to the release in this case, would bar the release's application. That is because the release does not explicitly mention that South was forbearing any claim against Texaco specifically for mesothelioma. Whether *Wicker* also bars the release necessitates, according to the Third Circuit, a "fact-intensive" examination to ascertain the parties' intent at the time the release was executed (142 F3d at 701), for which the *Wicker* court offered some guidelines. For example, "the validity of the release [should not] turn on the writing alone because of the ease in writing detailed boiler plate agreements" (*id.*). Further, written releases spelling out "the scope and duration of the known risks" would be "strong, but not conclusive, evidence of the parties' intent" (*id.*).

Here, subjecting it to the high level of scrutiny required by *Wicker*, we find that the release does not pass muster. To tease out the true intent South had when he signed the release, it is necessary to consider the context in which he did so. The 1997 complaint, while making generalized allegations that South had been exposed to asbestos, is exceedingly vague as to whether he had actually contracted an asbestos-related disease. To be sure, it mentions a "devastating pulmonary disease Plaintiff now suffers" and an exhaustive grab-bag of asbestos-related diseases, from asbestosis to mesothelioma to brain cancer. However, it is impossible to conclude from the complaint that South had actually received a diagnosis. Indeed, the "meager" consideration he received for resolving the claim suggests that he had not been diagnosed with an asbestos-related dis-

ease, much less one even approaching the severity of the mesothelioma that the complaint specifically alleges he had. The complaint leaves open that possibility, to the extent it seeks relief for fear of an asbestos-related disease and not for the disease itself. Accordingly, the risk of contracting an actual asbestos-related disease remained hypothetical to South, and we decline to read the release as if South understood the implications of such a disease but chose nonetheless to release Texaco from claims arising from it.

Further, if South had not received a definitive diagnosis at the time the 1997 complaint was filed, then the release, to the extent it warns him of the possibility of "a new and different diagnosis from the diagnosis as of the date of this Release," does not reflect the actual circumstances known to him, since the words "new" and "different" suggest that South had already been diagnosed with a disease when he executed the release. Rather, the lack of an actual diagnosis reveals the language in the release as mere boilerplate, and not the result of an agreement the parameters of which had been specifically negotiated and understood by South. Under even the stricter standard of *Wicker*, "the release[ ] do[es] not demonstrate [South] knew of the actual risks to which [he was] exposed and from which [Texaco] was being released" (142 F3d at 701).

The dissent acknowledges that *Wicker* cautions that a court, in interpreting a release such as the one at issue here, must probe beyond the release's words. However, it then disregards that requirement, stating that "the language of the release is clear and comprehensive" and that "the release's language establishes that the decedent understood that his exposure to asbestos could result in future injuries and diagnoses." Even when purporting to consider the context in which the release was executed, the dissent focuses only on the fact that the complaint mentions mesothelioma, concluding from that fact that South definitively intended to release a claim for it. Thus, the dissent directly contradicts *Wicker*'s determination that "the written release should not be conclusive" (142 F3d at 701).

Furthermore, the dissent points to no evidence that South appreciated the consequence of waiving a claim for mesothelioma. It cites *Oliverio v Consolidated Rail Corp.* (14 Misc 3d 219 [Sup Ct, Erie County 2006]) favorably; however, in that case, it appears that the plaintiff already had received a diagnosis of lung cancer when he signed the release. Accordingly, the court held, it could not be said that he should not reasonably have anticipated contracting a different sort of cancer at a later date, such as his bladder cancer, as a result of his initial

exposure to asbestos. The court's concern in *Oliverio* was that "[i]f a new claim were permitted for each and every new manifestation of the asbestos exposure, regardless of the extent of the parties' awareness of such risks, there would be no incentive on the part of the . . . defendant to ever compromise such claims" (14 Misc 3d at 222). Here, again, there is no evidence that South had *any* manifestation of his asbestos exposure at the time he executed the release. Under those circumstances, it cannot be said that Texaco carried its burden of proving that the release is enforceable. Concur—Manzanet-Daniels, Mazzarelli and Webber, JJ.

Tom, J.P., dissents in a memorandum as follows: In this matter, the parties executed a release that should be enforced and that constitutes a complete bar to this action (*see Global Mins. & Metals Corp. v Holme*, 35 AD3d 93, 98 [1st Dept 2006], *lv denied* 8 NY3d 804 [2007]). The release was properly limited to those risks known to the parties at the time of its execution (*see Wicker v Consolidated Rail Corp.*, 142 F3d 690, 701 [3d Cir 1998], *cert denied* 525 US 1012 [1998]), including the known risk that the decedent could contract mesothelioma in the future. Accordingly, because I find the release enforceable, I would reverse the order and dismiss the complaint. Therefore, I respectfully dissent.

Plaintiff's decedent, Mason South, served as a merchant mariner for over 35 years, during which time, he alleged, he was constantly exposed to asbestos friable fibers, causing him to inhale carcinogenic dust.

In 1997, the decedent (and a group of similarly situated plaintiffs) filed a Jones Act (46 USC § 30104 *et seq.*) claim in the United States District Court for the Northern District of Ohio against defendant Texaco and 115 other named defendants, alleging that he had suffered injury during his career as a merchant mariner. He alleged, inter alia, that, "[a]s a direct and proximate result of said exposure to asbestos aboard the said vessels as well as secondary or passive smoke that hung still in the atmosphere free from dissipation for lack of adequate ventilation, Plaintiff suffers cancerphobia, traumatic stressful fear of affliction and worsening of pneumoconiosis as well as exacerbation of existing diseases; and suffers anatomical disorder, structural changes, pulmonary diseases inclusive of asbestosis/mesothelioma/lung cancer/pneumoconiosis/chronic obstructive pulmonary disease/colon cancer/stomach cancer/ rectal cancer/kidney cancer/pancreas cancer/pharynx cancer/ brain cancer/other anatomical cancer, et cetera, either singularly or in combination thereof; and, moreover, Plaintiff suffers

harm in the form of necessity to be monitored for other asbestotic diseases including lung cancer."

The decedent settled his claims against Texaco, executing a comprehensive release of all claims against the company. At the time of the release the decedent did not suffer from mesothelioma. The release stated that the decedent, for "himself, his heirs, administrators, beneficiaries, executors and assigns," released Texaco "forever" from any and all "actions, suits, [and] claims" which he "has now, has ever had, or which may accrue in the future." The release included any "bodily and/or personal injuries, sickness or death" allegedly caused as a result of the decedent's asbestos exposure.

The decedent also stated in the release that he understood that the "long term effects of exposure" to asbestos might result in "obtaining a new and different diagnosis" from the diagnosis at the time of the release. He stated that despite this, he knew that he would be giving up the right to bring an action against Texaco in the future for "any new or different diagnosis that may be made" as a result of his exposure to any asbestos or other product. This provision also pertained to the decedent's executors, administrators, and heirs. The decedent acknowledged that he had read the full release, discussed it with his attorney, and was signing it freely and with full knowledge of its contents, and that he would be legally bound by it.

Unfortunately, 17 years later, in 2014, when the decedent had reached the age of 86, he was diagnosed with malignant mesothelioma. In 2015, he and his wife commenced this action asserting claims sounding in negligence and under the Jones Act against five defendants, including Chevron Corporation, the alleged successor in interest, by merger, to Texaco. He alleged, as he had similarly alleged in the 1997 Jones Act claim, that he had suffered exposure to asbestos friable fibers throughout his Merchant Marine career, resulting in his contracting mesothelioma. His wife asserted derivative claims. The decedent died during the pendency of this action as a result of the mesothelioma. His wife, as executor of his estate, was substituted as plaintiff.

Defendant Texaco moved for summary judgment dismissing the complaint as against it, arguing that the 1997 release barred any and all future claims against it arising from the decedent's exposure to friable asbestos fibers. Texaco further argued that the unambiguous language of the release demonstrated that thoughtful negotiation was had in arriving at its terms and that the decedent clearly gave up his right to sue Texaco for any future diagnosis arising from alleged asbestos exposure.

Plaintiffs opposed, arguing that the Federal Employers' Liability Act (FELA) (45 USC § 51 *et seq.*), which requires strict scrutiny of releases, applies to Jones Act claims. Plaintiffs contended that under that standard, because at the time the decedent signed the release he did not have mesothelioma, and was not aware of the risk of mesothelioma as a potential injury from his asbestos exposure, his current claim was not barred.

Texaco replied that FELA applies only to railroad workers, not mariners, and in any event, the release bars the current claims even under the heightened FELA standard.

Supreme Court denied defendant's motion. As a threshold matter, the court held that federal law governed this Jones Act/maritime law action and that the Jones Act "incorporates not only the FELA statutes but also its [sic] entirely judicially developed doctrine of liability" (internal quotation marks omitted). Accordingly, the court concluded that the 1997 release was to be strictly examined, and would only be enforced to the extent "it reflect[ed] a bargained-for settlement of a known claim for a specific, known injury suffered."

Noting that there is a split in the federal circuits as to whether FELA permits a release of future claims for known risks, the motion court found that under either the Sixth Circuit's bright-line test voiding releases attempting to bar future claims for known or unknown risks or the Third Circuit's more lenient test enforcing such releases provided that the plaintiff understood the actual, specific risks being released, Texaco had failed to meet its burden to show that the decedent understood he was releasing it from a future claim for mesothelioma.

On appeal, Texaco asserts that the 1997 release should be enforced because it constitutes a settlement of a known claim. In that regard, Texaco notes that the release resolved the decedent's action arising out of his exposure to asbestos and that the parties contemplated all injuries that might later arise due to that exposure. Texaco points out that the 1997 complaint specifically mentioned mesothelioma as one of the known diseases, and argues that thus the release clearly intended to resolve any future claim of mesothelioma. And Texaco highlights the expansive language of the release, including the decedent's recognition that his exposure to asbestos might result in "obtaining a new and different diagnosis" from the diagnosis at the time of the release but that he would be giving up the right to bring an action against Texaco in the future for "any new or different diagnosis that may be made" as a result of his exposure to asbestos.

It should be noted that "[s]tipulations of settlement are favored by the courts and not lightly cast aside" (*Hallock v State of New York*, 64 NY2d 224, 230 [1984]) and that "[s]trong policy considerations favor the enforcement of settlement agreements" (*Denburg v Parker Chapin Flattau & Klimpl*, 82 NY2d 375, 383 [1993]). As the Court of Appeals has explained, this is because "[a] negotiated compromise of a dispute avoids potentially costly, time-consuming litigation and preserves scarce judicial resources; courts could not function if every dispute devolved into a lawsuit. Moreover, there is a societal benefit in recognizing the autonomy of parties to shape their own solution to a controversy rather than having one judicially imposed. Additionally, a settlement produces finality and repose upon which people can order their affairs" (82 NY2d at 383).

Similarly, this Court has recognized that "a valid release constitutes a complete bar to an action on a claim which is the subject of the release" (*Global Mins. & Metals Corp. v Holme*, 35 AD3d 93, 98 [1st Dept 2006], *supra*). Therefore, "[i]f the language of a release is clear and unambiguous, the signing of a release is a jural act binding on the parties" (*Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.*, 17 NY3d 269, 276 [2011] [internal quotation marks omitted]).

Because the subject release is governed by the law applicable to Jones Act claims and general maritime law, the responsibility is Texaco's to establish the enforceability of the release, rather than plaintiff's to overcome it (*see Garrett v Moore-Mc-Cormack Co.*, 317 US 239 [1942]). The Jones Act incorporates FELA (*see Rabenstein v Sealift, Inc.*, 18 F Supp 3d 343, 351 n 6 [ED NY 2014]), which, in turn, prohibits releases that seek to exempt a defendant entirely from any liability under FELA (*see Callen v Pennsylvania R. Co.*, 332 US 625, 630-631 [1948]). However, the United States Supreme Court has determined that FELA does allow parties to compromise an actual, claimed liability via a release (*id.* at 631).

Due to the aforementioned split in the federal circuits, and since "neither the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, nor any of the Appellate Divisions have addressed the issue of the proper standard to be applied in judging whether a particular release may be enforced against a claim under the FELA" (*Oliverio v Consolidated Rail Corp.*, 14 Misc 3d 219, 221 [Sup Ct, Erie County 2006]), the issue as to the standard by which the language of the release should be judged needs to be decided.

In *Babbitt v Norfolk & W. Ry. Co.* (104 F3d 89, 93 [6th Cir 1997]), the Sixth Circuit concluded that for a FELA release to

be valid, it "must reflect a bargained-for settlement of a known claim for a specific injury, as contrasted with an attempt to extinguish potential future claims the employee might have arising from injuries known or unknown by him." In contrast, the Third Circuit, in *Wicker v Consolidated Rail Corp.* (142 F3d 690 [3d Cir 1998]), recognized the beneficial predictability of the Sixth Circuit's bright-line rule, but ultimately decided to take a different approach, reasoning that "it is entirely conceivable that both employee and employer could fully comprehend future risks and potential liabilities and, for different reasons, want an immediate and permanent settlement. The employer may desire to quantify and limit its future liabilities and the employee may desire an immediate settlement rather than waiting to see if injuries develop in the future. To put it another way, the parties may want to settle controversies about potential liability and damages related to known risks even if there is no present manifestation of injury" (*id.* at 700-701).

The Third Circuit therefore determined that a release does not violate FELA if "the scope of the release is limited to those risks which are known to the parties at the time the release is signed" (*Wicker*, 142 F3d at 701). At the same time, the *Wicker* court cautioned that "the validity of the release [should not] turn on the writing alone because of the ease in writing detailed boiler plate agreements," and that there should be a "fact-intensive" examination to ascertain the parties' intent at the time the release was executed (*id.*). Thus, written releases spelling out "the scope and duration of the known risks" would be "strong, but not conclusive, evidence of the parties' intent" (*id.*).

The *Wicker* approach takes a more "[ ]realistic view on how parties compromise claims" and reasonably permits parties to compromise over specific risks that are contemplated by them (*Oliverio*, 14 Misc 3d at 221-222). This approach is the better and more workable one for cases predicated on exposure to asbestos. As the court noted in *Oliverio*: "This is particularly true with respect to claims based upon exposure to asbestos, where effects of the exposure may be latent for a considerable period of time. If a new claim were permitted for each and every new manifestation of the asbestos exposure, regardless of the extent of the parties' awareness of such risks, there would be no incentive on the part of the railroad defendant to ever compromise such claims. This result would not further the public policy of encouraging settlement of claims" (14 Misc 3d at 222).

Moreover, this approach "permits the enforcement of the

release for not only the specific injuries already manifested at the time of its execution, but also any risks of future injury which the parties specifically contemplated in its execution, so long as those risks are properly within the ambit of the claim compromised. This approach provides a realistic view of compromises and releases, while staying true to the prohibition on blanket relinquishments of rights under FELA" (*id.*).

Turning to the release in this case, I find that Texaco met its burden to show that the release was valid and bars this action, as it released Texaco from all claims and actions arising from the decendant's exposure to asbestos. As *Wicker* instructs, the language of the release constitutes strong evidence of the parties' intent. Notably, the language of the release is clear and comprehensive and releases Texaco for any injury that would occur as a result of exposure to asbestos. Further, the release's language establishes that the decedent understood that his exposure to asbestos could result in future injuries and diagnoses, including at some point many years into the future, but that despite those risks he agreed to give up his right to bring any actions against Texaco for "any new or different diagnosis" as a result of his exposure to asbestos.

The majority's assertion that my writing "points to no evidence that South appreciated the consequence of waiving a claim for mesothelioma" is belied by the record. In the context of the decedent's execution of the release, it is apparent that although he was not suffering from mesothelioma at the time he executed the release, he sought recovery for, and specifically listed, that disease in his settled 1997 complaint as one of the illnesses he could contract from his exposure to asbestos. Thus, the complaint demonstrates that the decedent was aware of the specific risk of contracting mesothelioma at the time of the release, and freely chose to waive his right to sue for that potential injury. It is of no moment that he may not have received any particular diagnosis at the time of the release. The very point of the compromise contained in the release is that the decedent was waiving any future rights to sue Texaco even though he was acknowledging that he could in the future contract an asbestos-related disease, including the various diseases listed in his 1997 complaint, which include mesothelioma.

The majority misapprehends the *Wicker* standard in focusing on whether there was evidence that the decedent was diagnosed with an asbestos-related disease at the time of the release. As set forth above, *Wicker* permits releases that which cover "risks which are known to the parties at the time the release is

signed" (142 F3d at 701) and recognizes that parties can fully comprehend future risks and potential liabilities. In other words, under *Wicker*, as long as the risks are known, parties can waive future risks even if they do not have a current claim for such risks when they sign a release. Here, the decedent may not have had any manifestations of his exposure to asbestos, but he was fully able to comprehend the future risk of certain known illnesses that he could contract from exposure to asbestos, as reflected in detail in his 1997 complaint. Thus, at the time of the release, he knowingly released Texaco from liability in the event that he was diagnosed in the future with an asbestos-related disease, including mesothelioma, a risk of which he was aware. Therefore, contrary to the majority's contention, Texaco met its burden under *Wicker* to show that the release is enforceable.

Further, the release is a product of a compromise between the parties, each of which was represented by counsel, to settle the decedent's claims for exposure to asbestos. Accordingly, the decedent's interests were protected by his counsel, and there is no evidence or even allegation of fraud, duress, collusion or mistake that would invalidate the agreement (*see Hallock*, 64 NY2d at 230).

While the amount of consideration received by decedent for the release is contained neither in the language of the release nor elsewhere in the appellate record, the motion court characterized the amount as low and "meager." However, even accepting the amount paid was small, the decedent decided to accept it even while he knew he risked contracting asbestos-related diseases and could not bring any future claims against Texaco. It should be noted that the decedent did not suffer from mesothelioma at the time of the release but was diagnosed with the disease 17 years later. The decedent could have received a low settlement because he did not suffer from an asbestos-related disease at the time of the release.

Moreover, Texaco had a reasonable expectation of finality with respect to the specific claim of asbestos exposure, and the settlement paid was likely to have been based upon that expectation. Policy considerations favor permitting parties such as these to craft their only solutions to disputes, and enforcement of these agreements promotes both finality and judicial economy. Thus, it is appropriate to enforce the release in this action "where the claim arises out of precisely the same asbestos exposure that was compromised in the earlier settlement and release" (*Oliverio*, 14 Misc 3d at 223).

In addition, in contrast with the releases invalidated in

*Wicker*, the release here did not seek to insulate Texaco from liability beyond the specific controversies that were settled. Indeed, unlike the instant release, the releases in *Wicker* "recite[d] a series of generic hazards to which [plaintiffs] might have been exposed, rather than specific risks the employees faced during the course of their employment" (142 F3d at 701). Accordingly, based on those circumstances, the Third Circuit found that "the releases do not demonstrate the employees knew of the actual risks to which they were exposed and from which the employer was being released" (*id.* at 701). Here, however, the release focused on the specific exposure to asbestos that the decedent knew he had faced during the course of his employment and acknowledged the risks of future diseases related to asbestos exposure as reflected in the decedent's 1997 claim, and thus demonstrated that the decedent knew the actual risks to which he was exposed and from which Texaco was being released.

Accordingly, I would reverse the order on appeal, and grant Texaco's motion for summary judgment dismissing the complaint as against it.